## NORTHWEST CENTRAL PIPELINE CORP. *v.* STATE CORPORATION COMMISSION OF KANSAS ET AL.

No. 86–1856.   Argued November 29, 1988—Decided March 6, 1989

494

BRENNAN, J., delivered the opinion for a unanimous Court.

*Harold L. Talisman* argued the cause for appellant. With him on the briefs were *Bobby Potts, Lewis A. Posekany, Jr., John H. Cary, Jeffrey D. Komarow, Michael E. Small,* and *Mark H. Adams II.*

*Frank A. Caro, Jr.,* argued the cause for appellee. With him on the brief was *Shari M. Feist.*

*Michael R. Lazerwitz* argued the cause for the United States and the Federal Energy Regulatory Commission as *amici curiae* urging affirmance. With him on the brief were *Solicitor General Fried, Deputy Solicitor General Merrill, Harriet S. Shapiro, Catherine C. Cook, Jerome M. Feit, John H. Conway,* and *Timm L. Abendroth.*\*

JUSTICE BRENNAN delivered the opinion of the Court.

In this appeal, we must decide whether a regulation adopted by the State Corporation Commission of Kansas (KCC) to govern the timing of production of natural gas from the Kansas-Hugoton field violates either the Supremacy or the Commerce Clause of the Constitution. We hold that it does not.

---

\*Briefs of *amici curiae* urging affirmance were filed for the Council of State Governments et al. by *Benna Ruth Solomon, Beate Bloch,* and *Robert F. Shapiro;* for the Interstate Oil Compact Commission by *Richard C. Byrd* and *W. Timothy Dowd;* and for the Railroad Commission of Texas et al. by *Hal Stratton,* Attorney General of New Mexico, *Robert G. Stovall,* Assistant Attorney General, *Nicholas J. Spaeth,* Attorney General of North Dakota, *Lindil C. Fowler, Jr., G. Gail Watkins,* and *David B. Robinson.*

## I

At issue is a KCC regulation providing for the permanent cancellation of producers' entitlements to quantities of Kansas-Hugoton gas. Designed as a counterweight to market, contractual, and regulatory forces that have led interstate pipelines to cut back purchases from Kansas-Hugoton producers, the KCC's regulation seeks to encourage timely production of gas quotas by providing that the right to extract assigned amounts of gas will permanently be lost if production is too long delayed. Appellant Northwest Central Pipeline Corporation, an interstate pipeline, argues that the KCC's regulation is pre-empted by federal regulation of the interstate natural gas business because it exerts pressure on pipelines to increase purchases from Hugoton producers and so affects their purchase mixes and cost structures, and because it impinges on exclusive federal control over the abandonment of gas reserves dedicated to interstate commerce. Northwest Central also urges that the regulation violates the Commerce Clause because it coerces pipelines to give Kansas producers a larger share of the interstate gas market at the expense of producers in other States, or, alternatively, causes the diversion of gas from the interstate to the intrastate market.

## A

Kansas' regulation of the Hugoton field is an effort to solve perplexing problems in assigning and protecting property rights in a common pool of gas and in preventing waste of limited natural resources. Gas migrates from high-pressure areas of a pool around shut-in (or slow-producing) wells to low-pressure areas around producing (or faster producing) wells. As a consequence of this phenomenon a single producing well might exhaust an entire gas pool, though rights in the pool belong to many different owners. Absent countervailing regulation or agreement among all owners, the fact that gas migrates to low-pressure, heavily produced areas creates an incentive for an owner to extract gas as fast as

possible, in order both to prevent other owners draining gas it might otherwise produce, and to encourage migration to its own wells that will enable it to capture a disproportionate share of the pool. A rush to produce, however, may cause waste. For example, gas may be produced in excess of demand; more wells may be drilled than are necessary for the efficient production of the pool; or the field may be depleted in such a way that it is impossible to recover all potentially available mineral resources (in particular oil, which is recovered using reservoir energy often supplied by associated natural gas reserves). See generally McDonald, Prorationing of Natural Gas Production: An Economic Analysis, 57 U. Colo. L. Rev. 153 (1985–1986).

The common-law rule of capture, whereby gas was owned by whoever produced it from the common pool, left unchecked these twin problems of perceived inequities between owners of rights in the pool and of waste resulting from strong economic disincentives to conserve resources. *Ibid.* In response, producing States like Kansas have abandoned the rule of capture in favor of assigning more equitable correlative rights among gas producers and of directly regulating production so as to prevent waste. Kansas by statute prohibits waste, Kan. Stat. Ann. § 55–701 (1983); directs the KCC to "regulate the taking of natural gas from any and all common sources of supply within this state in order to prevent the inequitable or unfair taking of natural gas from a common source of supply," Kan. Stat. Ann. § 55–703(a) (Supp. 1987); and gives content to the concept of equitable taking of natural gas by obliging the KCC to regulate so that producers

"may produce only that portion of all the natural gas that may be currently produced without waste and to satisfy the market demands, as will permit each developed lease to ultimately produce approximately the amount of gas underlying the developed lease and currently produce proportionately with other developed leases in the com-

mon source of supply without uncompensated cognizable drainage between separately-owned, developed leases or parts thereof." *Ibid.*

Pursuant to statutory authority, the KCC in 1944 adopted the Basic Proration Order for the Hugoton field, after finding that uncompensated drainage caused by disproportionate production had impaired the correlative rights of owners of developed Hugoton leases. See Basic Proration Order ¶¶ (d)–(f), App. 9–11. The object of the order was to fix a formula for determining well production quotas or "allowables" at such a level that, without waste, "each developed lease will be enabled to currently produce its . . . allowable so that ultimately such developed lease will have an opportunity to produce approximately the amount of gas which underlies such lease." App. 7; see also Basic Proration Order ¶ (j), App. 17. To this end, the KCC was to set a monthly gas production ceiling for the Kansas-Hugoton field based on estimates of market demand,[1] and to assign a portion of this production to individual wells as an allowable in an amount keyed to the acreage served by the well and to the well's "deliverability," or ability to put gas into a pipeline against pipeline pressure (a factor that increases with wellhead pressure). *Id.*, ¶¶ (g)–(l), App. 11–22.

The Hugoton Basic Proration Order also allows for tolerances in the production of a well's allowable to account for underproduction or overproduction, which may be caused by variations in demand for a producer's gas. If a well produces less than its allowable it accrues an "underage." If it

---

[1] The KCC determines market demand levels twice a year based upon an analysis of "reasonable, current requirements for consumption and use within and without the state over a six-month period, the open flow production, a series of nominations by producers, and requirement requests by purchasers." Lungren, Natural Gas Prorationing in Kansas, 57 U. Colo. L. Rev. 251, 257–258 (1985–1986) (footnotes omitted). The KCC thus does not regard itself as bound to treat pipelines' expected takes as the measure of market demand for the purpose of assigning allowables.

produces more than its allowable it accrues an "overage." Kansas' achievement of its goal that each well should have the opportunity eventually to produce approximately the gas underlying the developed lease depends upon drainage occurring over time to compensate for any accrued underage or overage.[2] At issue in this case is the constitutionality of the regulation the KCC adopted in 1983 to encourage production of, and hence compensating drainage for, vast underages that it found had accrued as a result of pipelines' decisions to use the Hugoton field for storage while taking gas for current needs from elsewhere.

Prior to the 1983 amendment, the Basic Proration Order for the Hugoton field provided that underages were canceled after they reached six or nine times the monthly allowable, depending upon the adjusted deliverability of the well, but that canceled underages could readily be reinstated so as in effect to be available for use at any time. *Id.*, ¶ (p), App. 23–24.[3] Under this regulatory scheme, however, the Hugo-

---

[2] As the Kansas Supreme Court explained the process of compensatory drainage in this case:

"When a well is underproduced in relation to its allowable, and relative to the other wells which are producing their allowables, its pressure becomes higher. If this condition is permitted to continue over a period of time, drainage occurs from the underproduced well with the higher pressure to the low pressure area of the overproduced wells. As pressure is a major component in determining adjusted deliverability, the pressure differences result in a higher adjusted deliverability for the underproduced wells with a resulting increase in the current allowable. When the larger allowable and underage is produced, the well's pressure drops below the other wells and compensating drainage occurs. After the pressure drop the adjusted deliverability for the well is decreased with a resulting decrease in its allowable. This is the technique utilized in the attempt to keep the wells in balance in the long pull." *Northwest Central Pipeline Corp.* v. *Kansas Corp. Comm'n*, 237 Kan. 248, 251, 699 P. 2d 1002, 1007 (1985), vacated and remanded, 475 U. S. 1002 (1986), on remand, 240 Kan. 638, 732 P. 2d 775 (1987).

[3] Prior to amendment, paragraph (p) provided that canceled underages

ton field had become greatly underproduced, with noncanceled underages totaling 204 billion cubic feet and canceled and unreinstated underages totaling 314 billion cubic feet as of September 1, 1982. App. to Juris. Statement 74a, 76a. It also appeared that the field was seriously imbalanced, because some producers had accrued substantial overages during the same period. App. 128–130.

This underproduction and imbalance resulted from a combination of interrelated market, contractual, and regulatory factors. Kansas-Hugoton gas is substantially dedicated by long-term contract to five interstate pipelines, including appellant Northwest Central. These pipelines purchase gas from Kansas producers for transportation and resale outside the State. A sixth major purchaser of Kansas-Hugoton gas is the Kansas Power and Light Company, which buys gas for the intrastate market.

The interstate pipelines generally entered into their current contracts to purchase Kansas-Hugoton gas at a time when the market was little developed and oligopsonic. These contracts usually provide for relatively low prices and do not contain "take-or-pay" provisions requiring the purchaser to pay for some minimum quantity of gas irrespective of whether it takes current delivery.[4] Since these contracts were made, however, the gas market has gone through consider-

---

" 'will be reinstated upon verified application therefore, showing that the wells are in an overproduced status; that the purchaser is willing and able to take the amounts of gas; and that the length of time proposed by applicant for the production of the amounts of gas to be reinstated is reasonable under the circumstances.' " App. 24.

[4] Take-or-pay provisions

"essentially requir[e] [pipelines] either to accept currently a certain percentage of the gas each well [is] capable of producing, or to pay the contract price for that gas with a right to take delivery at some later time, usually limited in duration. Take-or-pay provisions enable sellers to avoid fluctuations in cash flow and are therefore thought to encourage investment in well development." *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Bd. of Mississippi*, 474 U. S. 409, 412 (1986) *(Transco)*.

able changes. See Pierce, State Regulation of Natural Gas in a Federally Deregulated Market: The Tragedy of the Commons Revisited, 73 Cornell L. Rev. 15, 18–20 (1987). Following a period of federal maintenance of low wellhead price ceilings under the Natural Gas Act (NGA), 52 Stat. 821, as amended, 15 U. S. C. § 717 *et seq.*, an acute shortage of natural gas during the 1970's prompted Congress to enact the Natural Gas Policy Act of 1978 (NGPA), 92 Stat. 3352, 15 U. S. C. § 3301 *et seq.* To encourage production, the NGPA took wellhead sales of "new" and "high-cost" gas outside the coverage of the NGA, § 601(a)(1)(B), 15 U. S. C. § 3431(a)(1)(B), and provided instead for market-driven wellhead pricing, at first up to a high ceiling, and later with no ceiling. See § 102(b), 15 U. S. C. § 3312(b) (new gas ceilings); § 103(b), 15 U. S. C. § 3313(b) (high-cost gas ceilings); § 121, 15 U. S. C. § 3331 (elimination of price controls). Many pipelines responded to the availability of new, higher priced deregulated gas by committing themselves to long-term contracts at high prices that required them to take-or-pay for a large part of a producer's contractually dedicated gas reserves. When the market dwindled in the early 1980's, interstate pipelines reduced their takes under contracts with Kansas-Hugoton producers for "old," low-priced gas, in large part because these contracts included no take-or-pay penalty. As a result, production from parts of the field fell. In effect, interstate purchasers began to use the Hugoton field for storage while they took gas for their immediate needs from elsewhere—a practice facilitated by paragraph (p) of the Hugoton Basic Proration Order, which permitted stored gas to be produced more or less at any time.

At the same time, however, Kansas-Hugoton producers dependent upon other purchasers in different contractual and market situations suffered no cutback in takes and indeed accumulated substantial overages. See Pierce, 73 Cornell L. Rev., at 47. For example, wells produced by Mesa Petroleum Company delivering gas for the intrastate market to the

Kansas Power and Light Company were overproduced by 2.6 billion cubic feet by late 1982. *Northwest Central Pipeline Corp.* v. *Kansas Corp. Comm'n*, 237 Kan. 248, 252, 699 P. 2d 1002, 1008 (1985). See App. 128–130.

The substantial Hugoton underages and field imbalance prompted a KCC investigation. After conducting a hearing, the KCC, on February 16, 1983, issued the order challenged in this case, amending paragraph (p) of the Basic Proration Order to provide for the permanent cancellation of underages in certain circumstances.[5] The KCC determined that the imbalance between overproduced and underproduced Hugoton wells was causing drainage between wells that posed a

---

[5] Order of Feb. 16, 1983, App. to Juris. Statement 63a–80a, aff'd on rehearing, Order of Apr. 18, 1983, App. to Juris. Statement 81a–92a. As the Kansas Supreme Court explained:

"The amendments to paragraph (p) in dispute here divide the cancelled underage in the field into three categories: (1) underage cancelled prior to January 1, 1975; (2) underage cancelled between January 1, 1975, and December 31, 1982; and (3) underage cancelled after December 31, 1982. For each of the categories of underage the [KCC] established requirements to be met by producers seeking to have such underage reinstated. For the pre-1975 cancelled underage, a producer was required to make application for reinstatement . . . on or before December 31, 1983. For 1975 to 1982 cancelled underage, reinstatment must be requested by December 31, 1985. For underage cancelled after December 31, 1982, the producer has three years from the date of cancellation to apply for reinstatement. For any producer to request reinstatement of underage cancelled after 1974, the affected well must be in an overproduced status. Any underage not reinstated, or if reinstated not produced at the end of the alloted time period, will be cancelled permanently. A producer has sixty months in which to produce the reinstated underage." 237 Kan., at 253, 699 P. 2d, at 1008–1009.

The KCC has since amended paragraph (p) again, to make it easier for a producer to have underages reinstated and to find a buyer for its gas. The requirements that the well for which application for reinstatement is made be in an overproduced status, and that the applicant identify the purchaser for the gas have been removed to enhance producers' ability to participate in the open "spot" market. See Order of Sept. 16, 1987, App. to Brief for Appellee 7a–16a.

threat to the correlative rights of producers. The KCC further found that, were permanent cancellation of underages the alternative to their timely production, existing underages might be reduced, future underages deterred, and balance restored to the field. App. to Juris. Statement 72a–75a.[6] As Mr. Ron Cook, a member of the KCC's staff, explained in his testimony at the hearing, producers that had accrued substantial underages might never be able to produce them without a rule change, and hence might not be able to benefit from their correlative rights to a proportionate share of the field's reserves:

> "Correlative rights have been and are currently being violated by the uncompensated drainage that is occurring due to the unratable taking of allowables between offsetting leases. Future projection of gas production from the Hugoton Field indicate[s] that this trend of accumulating more underage and cancelled underage will continue for a number of years.
>
> "There is a definite possibility that near the end of many of the wells['] productive li[ves], there will be a tremendous amount of cancelled underage that will never be reinstated due to the physical inability of the wells to make up such underage. This will result in a greater violation of correlative rights, because under the present provisions of Paragraph P of the basic order, there is no incentive to reinstate cancelled underage in a timely manner in order to prevent the large volumes of underage which will be cancelled permanently at the time the well is abandoned.

---

[6] The KCC also stated that the quantity of underages had simply made it too difficult to administer the field to achieve statutorily defined goals: "In the future, it will be practically impossible to ascertain the balance of the field if underages relate backward in perpetuity. Some sort of benchmark is necessary if the Commission is to effectively balance takes from the field." App. to Juris. Statement 76a.

> "Therefore, it is the intent of the staff's propos[ed amendment to paragraph (p)] to provide an incentive for the producer and purchaser to run more gas in order to prevent more underage being cancelled and to establish . . . a timely manner in which to begin reinstating and making up previously cancelled underage." App. 35–36; see also Pierce, 73 Cornell L. Rev., at 47.

Thus, the purpose of the new regulation was to "instill the incentive for the purchasers and the producers to run more gas out of the field," App. 44, in order that Kansas producers with underages might produce their current allowables and accumulated underage and obtain compensating drainage, *id.*, at 49, prior to the field's exhaustion, see *id.*, at 48.[7]

---

[7] The KCC plainly stated that its intent in adopting the 1983 amendment to paragraph (p) was to protect producers' correlative rights. But its attempt to explain the precise relationship between its order and such rights—as opposed to the explanation offered by its staff member Mr. Cook, quoted in the text—foundered upon a misconstruction of the Kansas law defining correlative rights. The KCC apparently believed the amendment would protect the correlative rights of producers who *were* producing their current allowables "to participate in a given market for a given period of time." *Id.*, at 73a. Because adjusted deliverability varies with well pressure, see *supra*, at 500, and n. 2, a heavily producing operator's share of the field allowable falls as its well pressure falls in relation to that of shut-in wells. App. to Juris. Statement 73a and 75a; see also App. 128–129. If all wells produce their allowables, however, pressure will decrease uniformly over the field and these fluctuations in producers' shares of field allowables—and hence in their ability to participate in the market at a particular time—will not occur. The KCC's view that this was desirable depended upon an assumption that correlative rights inhere in *current* production, rather than in production over the life of the field. The Kansas Supreme Court expressly disapproved that construction of state law in this case. 237 Kan., at 256–257, 699 P. 2d, at 1010–1011. The court held, though, that the KCC's error did not undermine its order because the order did not in fact conform to the KCC's new definition of correlative rights in current production (and indeed the court believed that no workable order could do so, since it was not possible for the KCC to "force current equal production from all wells in the common source of supply," *id.*, at 257, 699 P. 2d, at 1011). Instead, the court decided, paragraph (p) con-

B

The natural gas industry is subject to interlocking regulation by both federal and state authorities. The NGA continues to govern federal regulation of "old" gas — gas already dedicated to interstate commerce when the NGPA was enacted and not otherwise excluded from federal regulation — including most Kansas-Hugoton gas. NGA § 1(b), 15 U. S. C. § 717(b), provides for exclusive Federal Energy Regulatory Commission (FERC) jurisdiction over "the transportation of natural gas in interstate commerce, . . . the sale in interstate commerce of natural gas for resale . . . , and . . . natural-gas companies engaged in such transportation or sale." This jurisdiction encompasses regulation of market entry through FERC's authority to issue certificates of public convenience and necessity authorizing pipelines to transport and sell gas in interstate commerce, NGA § 7(e), 15 U. S. C. § 717f(e), and of market exit through FERC's control over the abandonment of certificated interstate service. NGA § 7(b), 15 U. S. C. § 717f(b). FERC's powers also extend to enforcing wellhead price ceilings for old gas, now set forth in §§ 104 and 106(a) of the NGPA, 15 U. S. C. §§ 3314 and 3316(a); and to regulating other terms of sales of regulated gas for resale, ensuring that rates, and practices and contracts affecting rates, are just and reasonable. NGA §§ 4 and 5, 15 U. S. C. §§ 717c and 717d; see NGPA § 601(a), 15 U. S. C. § 3431(a). Pursuant to these powers FERC regulates the mix of purchases by natural gas pipelines. See, e. g., *Northwest Central Pipeline Corp.*, 44 FERC ¶ 61,222 (1988), aff'g 33 FERC ¶ 63,067 (1985) (finding various of appellant's purchasing practices to be prudent). A pipeline's purchase mix affects

formed to the statutory definition of correlative rights as a producer's right eventually to recover the gas underlying its leases, *id.*, at 256–257, 699 P. 2d, at 1011, apparently for the reasons Mr. Cook stated in his testimony, see *id.*, at 261–263, 699 P. 2d, at 1014–1015.

both its costs and the prices for which it sells its gas, see, *e. g.*, *Columbia Gas Transmission Corp.*, 43 FERC ¶ 61,482 (1988) (average cost of gas purchases passed through to pipeline's customers), and so comes within FERC's exclusive authority under the NGA "to regulate the wholesale pricing of natural gas in the flow of interstate commerce from wellhead to delivery to consumers." *Maryland* v. *Louisiana*, 451 U. S. 725, 748 (1981).[8]

Section 1(b) of the NGA, 15 U. S. C. § 717(b), also expressly carves out a regulatory role for the States, however, providing that the States retain jurisdiction over intrastate transportation, local distribution, and distribution facilities, and over "the production or gathering of natural gas."

Relying on *Northern Natural Gas Co.* v. *State Corporation Comm'n of Kansas*, 372 U. S. 84, 90–93 (1963), for the proposition that the federal regulatory scheme pre-empts state regulations that may have either a direct or indirect effect on matters within federal control, Northwest Central challenged the new paragraph (p) of the Basic Proration Order on the grounds that, though directed to producers, it impermissibly affects interstate pipelines' purchasing mix and hence price structures, and requires the abandonment of gas dedicated to interstate commerce, both matters within FERC's jurisdiction under the NGA. On rehearing, the KCC dismissed this challenge, distinguishing *Northern Natural* because the rule at issue there had directly regulated purchasers; the purpose of the amendment to paragraph (p), on the

---

[8] Under the NGA, FERC engaged in "'utility-type ratemaking' control over prices and supplies," *Transco*, 474 U. S., at 420. Though the NGPA removed from affirmative federal control the wellhead price of new and high-cost gas, nevertheless it "did not compromise the comprehensive nature of federal regulatory authority over interstate gas transactions," *Schneidewind* v. *ANR Pipeline Co.*, 485 U. S. 293, 300, n. 6 (1988), and this Court held in *Transco* that Congress' intent in the NGPA that the supply, the demand, and the price of deregulated gas be determined by market forces requires that the States still may not regulate purchasers so as to affect their cost structures. 474 U. S., at 422–423.

other hand, "is to prevent waste, protect the correlative rights of mineral interests owners and promote the orderly development of the field, functions clearly reserved to the states under the production exemption of the [NGA]. The February 16th order does not require pipelines purchasers to do anything or refrain from doing anything." App. to Juris. Statement 87a. On petition for judicial review, the District Court of Gray County, Kansas, found that the change in paragraph (p) would provide an incentive to purchasers to take more Kansas-Hugoton gas, and as a result would "cause a change in the 'mix' of natural gas which pipelines transport for sale many miles away." *Id.*, at 58a. But despite the new order's probable consequences for pipeline purchasing practices and price structures, the District Court held that it fell within the production and gathering exemption of NGA § 1(b), 15 U. S. C. § 717(b), because it was directed to gas producers, which were the subject of the threatened cancellation of allowables. *Id.*, at 59a. The Kansas Supreme Court affirmed on the same ground. *Northwest Central Pipeline Corp.* v. *Kansas Corp. Comm'n*, 237 Kan. 248, 699 P. 2d 1002 (1985). It stated that the challenged order "obviously is intended for purchasers." *Id.*, at 266, 699 P. 2d, at 1017. Nevertheless, the court held that because the order directly related to producers' allowables, and because "the matter of allowables must be construed to pertain to production[, t]he rules on underages are a part of production regulation and thus are not violative of the [NGA], even though purchasers are indirectly caught in the backwash." *Id.*, at 267, 699 P. 2d, at 1017.

We vacated the Kansas Supreme Court's judgment, *Northwest Central Pipeline Corp.* v. *Corporation Comm'n of Kansas*, 475 U. S. 1002 (1986), and remanded for further consideration in light of our decision in *Transcontinental Pipe Line Corp.* v. *State Oil and Gas Bd. of Mississippi*, 474 U. S. 409 (1986) *(Transco)*—a case in which we had declared the post-NGPA vitality of *Northern Natural's* holding that state

regulations requiring purchasers to take gas ratably from producers are pre-empted by the federal regulatory power over pipelines' costs and purchasing patterns. See n. 8, *supra*. On remand, the Kansas Supreme Court reaffirmed its prior decision, distinguishing *Transco*, as it had *Northern Natural*, on the ground that the state regulation in that case governed the actions of purchasers rather than producers. It held that as a regulation of producers, aimed primarily at the production of gas rather than at its marketing, paragraph (p), as amended, was not pre-empted. 240 Kan. 638, 645–646, 732 P. 2d 775, 780 (1987). We noted probable jurisdiction, 486 U. S. 1021 (1988), and now affirm.

II

Congress has the power under the Supremacy Clause of Article VI of the Constitution to pre-empt state law. Determining whether it has exercised this power requires that we examine congressional intent. In the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law, *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218 (1947), or where the state law at issue conflicts with federal law, either because it is impossible to comply with both, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives, *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). See *Schneidewind* v. *ANR Pipeline Co.*, 485 U. S. 293, 299–300 (1988); *Louisiana Public Service Comm'n* v. *FCC*, 476 U. S. 355, 368–369 (1986); *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 203–204 (1983). Paragraph (p) of the Hugoton Basic Proration Order regulates in a field that Congress expressly left to the States; it does not conflict with the federal regulatory scheme; hence it is not pre-empted.

## A

We first consider appellant's claim that Kansas' paragraph (p) regulates in a field occupied by Congress, because it intrudes upon FERC's continuing authority under the NGA and NGPA comprehensively to regulate the transportation and prices of "old" gas sold in interstate commerce and to oversee interstate pipelines' purchasing mixes.

When it enacted the NGA, Congress carefully divided up regulatory power over the natural gas industry. It "did not envisage federal regulation of the entire natural-gas field to the limit of constitutional power. Rather it contemplated the exercise of federal power as specified in the Act." *FPC* v. *Panhandle Eastern Pipe Line Co.*, 337 U. S. 498, 502–503 (1949). Indeed, Congress went so far in § 1(b) of the NGA, 15 U. S. C. § 717(b), as to prescribe not only "the intended reach of the [federal] power, but also [to] specif[y] the areas into which this power was not to extend." 337 U. S., at 503. Section 1(b) conferred on federal authorities exclusive jurisdiction "over the sale and transportation of natural gas in interstate commerce for resale," *Northern Natural*, 372 U. S., at 89, at the same time expressly reserving to the States the power to regulate, among other things "the production or gathering of natural gas," that is, "the physical acts of drawing gas from the earth and preparing it for the first stages of distribution." *Id.*, at 90.

It has long been recognized that absent pre-emptive federal legislation or regulation, States may govern the production of natural resources from a common pool, in order to curb waste and protect the correlative rights of owners, by prorating production among the various wells operating in a field. See *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma*, 286 U. S. 210 (1932); *Thompson* v. *Consolidated Gas Utilities Corp.*, 300 U. S. 55 (1937). The power "to allocate and conserve scarce natural resources" remained with the States after the enactment of the NGA, as a result

of the system of dual state and federal regulation established in § 1(b) of that Act. *Northern Natural, supra*, at 93. The terms "production and gathering" in § 1(b) are sufficient in themselves to reserve to the States not merely "control over the drilling and spacing of wells and the like," *Colorado Interstate Gas Co.* v. *FPC*, 324 U. S. 581, 603 (1945), but also the power to regulate rates of production over time—a key element, after all, in efforts to prevent waste and protect correlative rights. In any event, the legislative history of the NGA, explored at length in our decision in *Panhandle Eastern, supra*, makes plain Congress' intent not to interfere with the States' power in that regard. The Solicitor of the Federal Power Commission (FPC), the predecessor of FERC, assured Congress that an earlier bill substantially similar to the NGA did "not attempt to regulate the gathering rates" of gas producers, that being a matter of purely local concern. Hearings on H. R. 11662 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 74th Cong., 2d Sess., 34 (1936); see *Panhandle Eastern, supra*, at 505, n. 7. And more generally, the legislative history of the NGA is replete with assurances that the Act "takes nothing from the State [regulatory] commissions: they retain all the State power they have at the present time," 81 Cong. Rec. 6721 (1937); see also *Panhandle Eastern, supra*, at 509–512, and n. 15—power that included the proration of gas production in aid of conservation and the protection of correlative rights.[9]

In considering whether Kansas in amending paragraph (p) has moved into a field that Congress has marked out for com-

---

[9] The legislative history of the NGPA also demonstrates that Congress viewed the States' power to prorate production as having survived enactment of the NGPA. The House Energy Committee Chairman told Congress that the NGPA "does not contemplate that FERC will intrude into the traditional conservation functions performed by the states. This is a matter reserved to the state agencies who, in the exercise of their historical powers, will continue to regulate such matters as . . . production rates." 124 Cong. Rec. 38366 (1978).

prehensive and exclusive federal control, we naturally must remember the express jurisdictional limitation on FERC's powers contained in § 1(b) of the NGA. Cf. *Louisiana Public Service Comm'n*, 476 U. S., at 370. That section fences off from FERC's reach the regulation of rates of gas production in "language . . . certainly as sweeping as the wording of the provision declaring . . . [FERC's] role." *Ibid.* The NGA "was designed to supplement state power and to produce a harmonious and comprehensive regulation of the industry. Neither state nor federal regulatory body was to encroach upon the jurisdiction of the other." *FPC* v. *Panhandle Eastern Pipeline Co.*, 337 U. S., at 513 (footnotes omitted). To avoid encroachment on the powers Congress intended to reserve to the States, we must be careful that we do not "by an extravagant . . . mode of interpretation push powers granted over transportation and rates so as to include production." *Id.*, at 513–514.

To find that Congress occupies the field in which Kansas' regulation operates would be to engage in just such an extravagant interpretation of the scope of federal power. Paragraph (p) is directed to the behavior of gas producers, and regulates their rates of production as a means of exercising traditional state control over the conservation of natural resources and the protection of correlative rights. To be sure, it specifically provides that producers' accrued underages will be canceled if not used within a certain period, and it is expected that this may result in pipelines making purchasing decisions that have an effect on their cost structures and hence on interstate rates. But paragraph (p) operates as one element in a proration scheme of precisely the sort that Congress intended by § 1(b) to leave within a State's authority, and in fact amounts to an effort to encourage producers to extract the allowables assigned under that proration scheme. It would be strange indeed to hold that Congress intended to allow the States to take measures to prorate production and set allowables in furtherance of legiti-

mate conservation goals and in order to protect property rights, but that—because enforcement might have some effect on interstate rates—it did not intend that the States be able to enforce these measures by encouraging actual production of allowables. In analyzing whether Kansas entered a pre-empted field, we must take seriously the lines Congress drew in establishing a dual regulatory system, and we conclude that paragraph (p) is a regulation of "production or gathering" within Kansas' power under the NGA.

By paying due attention to Congress' intent that the States might continue to regulate rates of production in aid of conservation goals and the protection of producers' correlative rights, we may readily distinguish *Northern Natural* and *Transco*, upon which appellant mainly relies.[10] In both those cases we held state regulations requiring gas purchasers to take gas ratably from producers were pre-empted, because they impinged on the comprehensive federal scheme regulating interstate transportation and rates. *Northern Natural*, 372 U. S., at 91–93; *Transco*, 474 U. S., at 422–424. In *Northern Natural*, we held that ratable-take orders "invalidly invade[d] the federal agency's exclusive domain" precisely because they were "unmistakably and unambiguously directed at *purchasers*." 372 U. S., at 92 (emphasis in original).[11] Interstate pipelines operate within the field reserved

---

[10] Appellant would also find support for its position in *Schneidewind*. *Schneidewind* held that the NGA pre-empted Michigan's regulation of securities issued by interstate pipelines and other natural gas companies engaged in interstate commerce because the regulation fell within an exclusively federal domain. However, not only was the regulation at issue in that case directed to interstate gas companies, but it also had as its central purposes the maintenance of their rates at what the State considered a reasonable level, and their provision of reliable service. 485 U. S., at 306–309. Unlike Kansas' regulation here, Michigan's could not plausibly be said to operate in the field expressly reserved by the NGA to the States.

[11] We noted in *Northern Natural* that States have alternatives to purchaser-directed ratable-take orders as means of checking waste and dispro-

under the NGA for federal regulation, buying gas in one State and transporting it for resale in another, so inevitably the States are pre-empted from directly regulating these pipelines in such a way as to affect their cost structures. *Ibid.* Likewise in *Transco*, in which we considered whether the rule in *Northern Natural* had survived deregulation of many interstate rates by the NGPA, we held that federal authority over transportation and rates—now expressed in a determination that rates should be unregulated and settled by market forces—continued to occupy the field and to pre-empt state ratable-take orders directed to pipelines and forcing upon them certain purchasing patterns. 474 U. S., at 422–424.

In both *Northern Natural* and *Transco*, States had crossed the dividing line so carefully drawn by Congress in NGA § 1(b) and retained in the NGPA, trespassing on federal territory by imposing purchasing requirements on interstate pipelines. In this case, on the contrary, Kansas has regulated production rates in order to protect producers' correlative rights—a matter firmly on the States' side of that dividing line. To find field pre-emption of Kansas' regulation merely because purchasers' costs and hence rates might be affected would be largely to nullify that part of NGA § 1(b) that leaves to the States control over production, for there can be little if any regulation of production that might not have at least an incremental effect on the costs of purchasers in some market and contractual situations. Congress has drawn a brighter line, and one considerably more favorable to the States' retention of their traditional powers to regulate rates of production, conserve resources, and protect correlative rights.

B

Congress' decision that the interstate natural gas industry should be subject to a dual regulatory scheme must also in-

portionate taking, and specifically mentioned "proration and similar orders directed at producers." 372 U. S., at 94–95, n. 12.

form consideration of appellant's claim that paragraph (p) is pre-empted because it conflicts with federal law regulating purchasers' cost structures. Congress has expressly divided regulatory authority between the States and the Federal Government in NGA § 1(b), though the production and interstate transportation and sale of gas "has to operate as a unitary enterprise." *FPC* v. *East Ohio Gas Co.*, 338 U. S. 464, 488 (1950) (Jackson, J., dissenting). It is inevitable that "jurisdictional tensions [will] arise as a result of the fact that [state and federally regulated elements coexist within] a single integrated system," *Louisiana Public Service Comm'n*, 476 U. S., at 375—particularly since gas is often produced under contracts, like those binding many Hugoton producers, that leave it to the purchaser to establish the rate of production through its decisions on takes. In the integrated gas supply system, these jurisdictional tensions will frequently appear in the form of state regulation of producers and their production rates that has some effect on the practices or costs of interstate pipelines subject to federal regulation. Were each such effect treated as triggering conflict pre-emption, this would thoroughly undermine precisely the division of the regulatory field that Congress went to so much trouble to establish in § 1(b), and would render Congress' specific grant of power to the States to regulate production virtually meaningless.

Thus, conflict-pre-emption analysis must be applied sensitively in this area, so as to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role.[12] State regulation of production

---

[12] Nevertheless, conflict-pre-emption analysis *is* to be applied, even though Congress assigned regulation of the production sphere to the States and Kansas has acted within its assigned sphere. When we declined in *Louisiana Public Service Comm'n* v. *FCC*, 476 U. S. 355 (1986), to reach a claim by the FCC that its regulation of depreciation practices pre-empted state depreciation rules because these were an obstacle to accomplishment of federal objectives, we were faced with a far different situation. In that case, which also involved a dual regulatory scheme, we held that in seek-

may be pre-empted as conflicting with FERC's authority over interstate transportation and rates if it is impossible to comply with both state and federal law; if state regulation prevents attainment of FERC's goals; or if a state regulation's impact on matters within federal control is not an incident of efforts to achieve a proper state purpose. *Schneidewind* v. *ANR Pipeline*, 485 U. S., at 299–300, 308–309. That Kansas sought to protect correlative rights and balance the Hugoton field by regulating producers in such a way as to have some impact on the purchasing decisions and hence costs of interstate pipelines does not without more result in conflict pre-emption; and we are not persuaded that either the particular nature of paragraph (p)'s effect on pipelines' costs or its relationship to the attainment of legitimate state goals creates a conflict with federal law that requires preemption.

Northwest Central has not asserted that there exists any conflict so direct that it is impossible for pipelines to comply with both paragraph (p) and with federal regulation of purchasing practices and pricing.[13] It does argue, however, that

---

ing to pre-empt state depreciation practices, the FCC had acted in an area over which Congress had explicitly denied it jurisdiction. *Id.*, at 374. Moreover, we recognized in *Louisiana Public Service Comm'n* that the possibility of jurisdictional tensions had been foreseen by Congress, which had established a process designed to resolve such tensions. *Id.*, at 375. In these circumstances, where the FCC lacked jurisdiction to act in the very area in which it was claiming to have power to pre-empt state law, and where in any event the federal statute provided a mechanism for resolving jurisdictional conflicts, a conflict-pre-emption analysis had no proper place. In the present case, however, it is argued that there is a potential for conflict even though each agency acts only within its assigned sphere, and there is no provision in the statute itself to resolve jurisdictional tensions. Only by applying conflict-pre-emption analysis can we be assured that *both* state and federal regulatory schemes may operate with some degree of harmony.

[13] Appellant's brief may conceivably be interpreted as claiming that it is impossible to comply with paragraph (p) and with federal prudent-purchasing requirements. That claim lacks merit for the reasons set out

Kansas' threat to cancel underages prevents the attainment of FERC's regulatory goals. Paragraph (p) imposes no purchasing requirements on pipelines, but simply defines producers' rights to produce gas from the Kansas-Hugoton field. Though Kansas hopes that its redefinition of production rights will increase purchasers' takes from the field, and though increased takes may affect pipelines' costs, *any* regulation of production rates by the States has potential impact on pipeline purchasing decisions and costs, and it is clear that Congress in the NGA intended federal regulation to take account of state laws defining production rights—not automatically to supersede them. *Supra*, at 510–511. Thus the Federal Government assures us that in its continuing regulation of old-gas rates and in its oversight of the prudence of appellant's purchase mix, FERC will recognize Kansas' order as part of the environment in which appellant conducts its business, and will make its own decisions with that in mind. Brief for United States et al. as *Amici Curiae* 21–22.[14] There may be circumstances in which the impact of state regulation of production on matters within federal control is

---

at n. 14, *infra*, but also for a more basic reason: paragraph (p) requires *nothing* of pipelines, and a state regulation that imposes no obligations on pipelines obviously cannot make it "impossible" for them to comply with federal law.

[14] Appellant argues that FERC's approval of its purchasing practices in the Kansas-Hugoton field as prudent, *Northwest Central Pipeline Corp.*, 44 FERC ¶ 61,222 (1988), demonstrates that the KCC rule seeking to prompt a change in those practices conflicts with federal goals. This argument is faulty for two reasons. First, a determination that it was prudent of Northwest Central to preserve low-cost Hugoton gas in favor of filling immediate needs with purchases under take-or-pay contracts in no way implies that it would have been *imprudent* for the pipeline to purchase a different mix of gas. Second, FERC's decision presupposed the continuing availability of stored reserves. *Id.*, at p. 61,825. As explained in the text, the prudence of purchasing mixes varies with the state regulatory environment. A ruling that a mix purchased in one regulatory environment is prudent obviously says little if anything about what would be prudent in a quite different environment.

so extensive and disruptive of interstate commerce in gas that federal accommodation must give way to federal preemption, but this is not one of them. Indeed, it appears that if paragraph (p) operates as a spur to greater production of low-cost Hugoton gas, this would be entirely congruous with current federal goals.[15]

The congressionally designed interplay between state and federal regulation under the NGA does not, however, permit States to attempt to regulate pipelines' purchasing decisions in the mere guise of regulating production. See *Schneidewind, supra,* at 308–309 (holding pre-empted a state law "whose central purpose is to regulate matters that Congress intended FERC to regulate"). The NGA does not require FERC to regulate around a state rule the only purpose of which is to influence purchasing decisions of interstate pipelines, however that rule is labeled. Such a rule creates a conflict rather than demands an accommodation. Where state law impacts on matters within FERC's control, the State's purpose must be to regulate production or other subjects of state jurisdiction, and the means chosen must at least plausibly be related to matters of legitimate state concern.

In this case, the KCC's avowed purpose in adopting paragraph (p) was to protect the correlative rights of Kansas producers. The protection of correlative rights is a matter traditionally for the States, often pursued through the regulation of production. The production regulation chosen by the KCC—threatening cancellation of underages to encourage pipelines to increase their takes from the Kansas-Hugoton field—was plausibly related to its stated and legiti-

---

[15] FERC has itself acted to encourage the production of low-cost gas, changing its rules on the abandonment of dedicated reserves to allow producers whose gas is committed to purchasers who do not wish to take it to sell their gas elsewhere, and attempting to give producers access to pipeline systems as a means of transporting their gas to willing buyers. Brief for United States et al. as *Amici Curiae* 4–5, 23. See Pierce, State Regulation of Natural Gas in a Federally Deregulated Market: The Commons Revisited, 73 Cornell L. Rev. 15, 20 (1987).

mate goal of protecting correlative rights. A KCC staff member cogently explained how the KCC believed that the threat permanently to cancel allowables would improve the field's balance and increase the likelihood that producers would eventually be able to extract the gas underlying their leases. *Supra*, at 504–505.

Appellant nevertheless suggests that the KCC's asserted purpose to protect correlative rights of underproduced operators is suspect, because its regulation will worsen correlative rights problems if in fact underages are cancelled. Brief for Appellant 30; Reply Brief for Appellant 5. It is true that if underages are permanently canceled, the producers who suffer cancellation may have less rather than more opportunity to produce the gas underlying their leases prior to the field's exhaustion, absent further meliorative regulation. It is also true that there was some evidence before the KCC suggesting that some pipelines might not increase their takes in response to the possible cancellation of underages, and that correlative rights might thus be harmed as a result of the new regulation. See *Northwest Central Pipeline Corp.* v. *Kansas Corp. Comm'n*, 237 Kan., at 261–262, 699 P. 2d, at 1014. The KCC's assumption that paragraph (p) would likely increase production was not implausible, however, and the Kansas Supreme Court specifically held that although the assumption was "controverted, there is evidence in the record to support [it]." 240 Kan., at 646, 732 P. 2d, at 780.[16] We cannot conclude that paragraph (p) lacks a proper state purpose, nor that it is so weakly related to such purpose that, because of its effect on federally regulated purchasing practices and pricing, it must be pre-empted.

---

[16] Changes in paragraph (p) since this litigation began tend to confirm that the KCC is seeking to protect producers' correlative rights. As explained in n. 5, *supra*, the KCC has relaxed its requirements for the reinstatement of underages and made it easier for a producer to sell its gas.

## C

Northwest Central further argues that paragraph (p) is pre-empted by federal regulation of the abandonment of natural gas. Section 7(c) of the NGA, 15 U. S. C. § 717f(c), requires that producers who sell natural gas to pipelines for resale in interstate commerce must obtain a certificate of public convenience and necessity from FERC. Section 7(b) of the Act, 15 U. S. C. § 717f(b), obligates certificated producers to continue supplying gas in the interstate market until FERC authorizes an abandonment. See *United Gas Pipe Line Co.* v. *McCombs*, 442 U. S. 529 (1979); *California* v. *Southland Royalty Co.*, 436 U. S. 519, 523–524 (1978).[17] Although the NGPA eliminated FERC's authority to control abandonment of deregulated gas, "old" Hugoton gas remains under FERC's § 7(b) control.[18] Appellant's claims are, first, that a producer's available reserves are a factor in FERC's decision whether to certificate interstate service, and that an abandonment of gas without FERC's approval undercuts FERC's certification process; and, second, that permanent cancellation of underages under paragraph (p) will lead to

[17] Section 7(b) provides:

"No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment."

We have said that it is "beyond argument" that the proscription of abandoning "any service" rendered by facilities under federal jurisdiction "would include both transportation and sale" of dedicated gas reserves, *United Gas Pipe Line Co.* v. *FPC*, 385 U. S. 83, 87 (1966), and have noted that § 7(b) "simply does not admit of any exception to the statutory procedure." *United Gas Pipe Line Co.* v. *McCombs*, 442 U. S., at 536.

[18] Pursuant to §§ 104, 106(a), and 601(a) of the NGPA, 15 U. S. C. §§ 3314, 3316(a), and 3431(a), "gas reserves dedicated to interstate commerce before November 8, 1978, remain subject to § 7(b) of the Natural Gas Act." *United Gas Pipe Line Co.* v. *McCombs, supra,* at 536, n. 9.

drainage from reserves dedicated to interstate commerce to wells operated by currently overproduced operators who supply the intrastate market, thus effectuating the permanent abandonment of gas reserves certificated to the interstate market.

Insofar as appellant's argument is that cancellation of underages pursuant to paragraph (p) will work an abandonment through the noncompensable drainage of dedicated reserves, and that Kansas therefore regulates in a field Congress has fully occupied, it is plainly meritless. This is so even if it is assumed that permanent cancellation of underage will in fact occur under paragraph (p), and that the KCC's belief that purchasers will instead increase their takes proves to have been too optimistic. The KCC's regulation governs the rights of producers to take gas from the Hugoton field, and determining rates of production is a matter squarely within the State's jurisdiction under NGA § 1(b). *Supra*, at 510–511. FERC's abandonment authority necessarily encompasses only gas that operators have a right under state law to produce. Appellant's premise—that the reserves of dedicated leases may not be abandoned without FERC approval—thus fails to support the conclusion it draws, for exactly what the producible reserves underlying a lease at any given moment consist in is a question of state law, settled in Kansas by the KCC's assignment of allowables and by its regulation of tolerances in producing those allowables.[19]

Nor is there merit to appellant's argument interpreted as a claim that paragraph (p) stands as an obstacle to the objective Congress sought to attain when it gave FERC authority over certification and abandonment—"to assure the public a reliable supply of gas." *United Gas Pipe Line Co.* v. *Mc-*

---

[19] The United States suggests that appellant's premise is false, as well as its conclusion, because gas is not dedicated and so subject to FERC's abandonment authority until it is actually produced at the wellhead. Brief for United States et al. as *Amici Curiae* 24–25. As appears in the text, we find no need to consider this contention.

*Combs, supra,* at 536. Unless clear damage to federal goals would result, FERC's exercise of its authority must accommodate a State's regulation of production. Here, Kansas is seeking to ensure that producers in fact have an opportunity to produce all the reserves underlying their leases before the Hugoton field is exhausted, by encouraging timely production. If a producer's gas is dedicated to interstate commerce, the effect Kansas reasonably hopes to achieve by paragraph (p) is that the dedicated gas will in fact be extracted and so will enter interstate commerce. That goal is entirely harmonious with the aim of federal certification and control of abandonment.

## III

Northwest Central also argues that paragraph (p) of the Basic Proration Order violates the Commerce Clause. Its first claim is that the KCC's regulation amounts to *per se* unconstitutional economic protectionism. Appellant contends that whatever the pipelines' reactions to the regulation, Kansas interests will benefit, and at the expense of interstate pipelines or of producers in other States. If the threat to cancel underages coerces interstate pipelines into increasing their takes from Kansas-Hugoton producers, those purchasers will have to take less gas from producers in other States. If, on the other hand, interstate pipelines fail to increase their takes in response to paragraph (p), then underages will permanently be canceled, and interstate purchasers will be unable as a result to obtain compensating drainage for the substantial overages that producers for the Kansas intrastate market have accrued. Alternatively, Northwest Central asserts that even if not a *per se* violation of the Commerce Clause, paragraph (p) must nevertheless be struck down upon application of the balancing test set forth in *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970). Neither argument persuades us.[20]

---

[20] Northwest Central asserts, as part of its argument that paragraph (p) violates the Commerce Clause, that the KCC has discriminated against interstate purchasers by setting allowables in excess of their market

We have applied a "virtually *per se* rule of invalidity" against state laws that amount to "simple economic protectionism," *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978), and have found such protectionism when a state law "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573, 579 (1986). See also *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 471–472 (1981). On its face, paragraph (p) is neutral, providing for the cancellation of underages of producers irrespective of whether they supply the intrastate or interstate market. In that respect it is entirely unlike the statute we struck down in *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923), which required pipelines to meet the demand of local consumers before supplying the interstate market. If paragraph (p) is unconstitutional *per se*, it must therefore be because of its effects.

The effects appellant suggests paragraph (p) might have on interstate commerce would be incident, however, to Kansas' efforts to regulate production to prevent waste and protect correlative rights—under the powers saved to the States in NGA § 1(b), 15 U. S. C. § 717(b),—by prorating production, setting allowables, and encouraging their production. See *supra*, at 510–511. Any regulatory encouragement to produce allowables in a timely manner may impact on a purchaser's distribution of its takes as among the producing States, as the purchaser reacts in light of its contractual and

---

demands. Appellant claims this has resulted in large underages for interstate producers, while operators supplying the intrastate market have been able to overproduce and create drainage in their favor; and that the effect of paragraph (p) is to cement this discrimination for all time by preventing interstate operators from producing their underages and so obtaining compensating drainage. We note, however, as did the Kansas Supreme Court, *Northwest Central Pipeline Co.* v. *Kansas Corp. Comm'n*, 237 Kan., at 257, 699 P. 2d, at 1011, that Northwest Central did not in this case challenge the level at which allowables were set, and that the KCC's calculation of allowables is not in issue here.

market situations, and of federal and other States' regulations. Congress cannot but have contemplated that state oversight of production would have some effect on interstate commerce. There would be little point to § 1(b)'s reservation to the States of power over production rates if the inevitable repercussions of States' exercise of this power in the arena of interstate commerce meant a State could not constitutionally enforce its proration orders. We are not prepared to render meaningless Congress' sweeping saving of power over production to the States by holding that a regulation intended to protect correlative rights by encouraging production of allowables, aimed at producers and requiring nothing of purchasers, *per se* violates the dormant Commerce Clause because purchasers have to take it into account in deciding whence to take gas and may as a result increase takes from in-state producers. Cf. *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 421–427 (1946) (recognizing Congress' power to specify that state action affecting interstate commerce does not violate the Commerce Clause).

Moreover, current federal policy is to encourage the production of low-cost gas, so that were paragraph (p) to increase takes from Kansas at the expense of States producing more costly gas, this would not according to FERC disrupt interstate commerce, but would improve its efficiency. See *supra,* at 518, and n. 15. "It thus appears that whatever effect the operation of [paragraph (p)] may have on interstate commerce, it is one which it has been the policy of Congress to aid and encourage through federal agencies in conformity to the [NGA and NGPA]." *Parker* v. *Brown,* 317 U. S. 341, 368 (1943). In *Parker,* we rejected a Commerce Clause challenge to a state regulation adopted under powers reserved to the States to control agricultural production. Though the regulation had an effect on interstate commerce, that effect was not "greater than or substantially different in kind from that contemplated by . . . programs authorized by federal statutes." *Ibid.* We held that in light of that congruity, we

could not "say that the effect of the state program on interstate commerce is one which conflicts with Congressional policy or is such as to preclude the state from this exercise of its reserved power to regulate domestic agricultural production." *Ibid.* We reach a similar conclusion here.

It is true that Kansas may fail in its efforts to encourage production of underages by threatening their cancellation, and noncompensable drainage to producers for the intrastate market may occur in consequence, absent further corrective regulation. But whether events will take this turn is a matter of pure speculation, cf. *Brown-Forman Distillers, supra,* at 583, contingent upon whether interstate purchasers, analyzing a multitude of market, regulatory, and contractual factors, decide it is economically beneficial to disregard Kansas' incentive timely to produce allowables. The Kansas Supreme Court held that the KCC's assumption that paragraph (p) likely would lead to increased takes by interstate purchasers was supported by evidence in the record, and any diversion of gas to the intrastate markets that might follow the cancellation of underages would be an unwanted, unexpected, and incidental effect of the KCC's legitimate endeavor to regulate production in the service of correlative rights. To strike down the KCC's production regulation as *per se* unconstitutional on the basis of such indirect and speculative effects on interstate commerce "would not accomplish the effective dual regulation Congress intended, and would permit appellant to prejudice substantial local interests. This is not compelled by the . . . Commerce Clause of the Constitution." *Panhandle Eastern Pipe Line Co.* v. *Michigan Public Service Comm'n,* 341 U. S. 329, 337 (1951).

Even if not *per se* unconstitutional, a state law may violate the Commerce Clause if it fails to pass muster under the balancing test outlined in *Pike* v. *Bruce Church, Inc.* Provided the challenged law "regulates evenhandedly to effectuate a legitimate local public interest," however, "and its effects on interstate commerce are only incidental, it will be upheld un-

less the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U. S., at 142. Paragraph (p) of the Hugoton Proration Order applies evenhandedly, without regard to whether a producer supplies the intrastate or interstate market, see *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S., at 471–472, and is an exercise of Kansas' traditional and congressionally recognized power over gas production. The paragraph's intended effect of increasing production from the Hugoton field, even granting that reduced takes from other States would result, is not "clearly excessive" in relation to Kansas' substantial interest in controlling production to prevent waste and protect correlative rights; and the possibility that paragraph (p) may result in the diversion of gas to intrastate purchasers is too impalpable to override the State's weighty interest. We likewise reject Northwest Central's claim that paragraph (p) must be invalidated under *Pike, supra*, at 142, because Kansas could have achieved its aims without burdening interstate commerce simply by establishing production allowables in line with Northwest Central's conception of market demand levels. Appellant has not challenged the KCC's determination of allowables, see n. 19, *supra*, and it identifies nothing in the record in this proceeding that could provide an adequate basis for determining that the KCC might have achieved its goals as effectively had it adopted a different formula for setting allowables, with a different approach to calculating market demand.

Paragraph (p) of the KCC's Basic Proration Order for the Hugoton field violates neither the Supremacy nor the Commerce Clause of the Constitution, and the judgment of the Kansas Supreme Court is

*Affirmed.*