No. 128,510

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SIERRA CLUB and VOTE SOLAR,
*Appellees/Cross-appellants*,

v.

KANSAS CORPORATION COMMISSION and
CITIZENS' UTILITY RATEPAYER BOARD,
*Appellees/Cross-appellees*,

and
EVERGY KANSAS CENTRAL, INC., EVERGY KANSAS SOUTH, INC.,
and EVERGY METRO, INC.,
*Appellants/Cross-appellees*.

SYLLABUS BY THE COURT

1.

It is well settled that parties in a judicial action must have standing as part of the Kansas case-or-controversy requirement imposed by the judicial power clause of article 3, section 1 of the Kansas Constitution.

2.

When an organization is suing on its members' behalf, it must establish associational standing via a three-prong test, showing (1) that at least one of its members would have standing to sue in their own right, (2) that the interests it seeks to protect are germane to the organization's purpose, and (3) that neither the claim asserted nor the relief requested requires participation of individual members.

3.

To satisfy the first prong of the associational standing test, an organization must show one of their members has suffered actual or threatened injury—i.e., the association

1

or one of its members must have suffered cognizable injury or have been threatened with an impending, probable injury and the injury or threatened injury must be caused by the complained-of act or omission.

4.

The Supremacy Clause of the United States Constitution invalidates state laws that interfere with, or are contrary to, federal law and has led to recognition that federal law may supersede state law in several different ways.

5.

Broadly speaking, a preemption analysis divides into two principal categories: express and implied preemption.

6.

The United States Supreme Court has identified two varieties of implied preemption: field preemption and conflict preemption. Field preemption occurs where a scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it. Conflict preemption occurs where state law or action directly conflicts with federal law such that it makes compliance with both federal and state law impossible or stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

7.

The United States Supreme Court has described the statutory scheme for the regulation of energy markets under the Federal Power Act (FPA) as an example of cooperative federalism. Under the FPA, the Federal Energy Regulatory Commission (FERC) has exclusive authority to regulate the sale of electric energy at wholesale in interstate commerce. But the law places beyond FERC's power, and leaves to the states alone, the regulation of any other sale—most notably, any retail sale—of electricity.

8.

Under the facts of this case, a public utility's application with the Kansas Corporation Commission for approval of tariff changes related to wholesale demand response participation is not preempted by federal law.

Appeal from Johnson District Court; JAMES F. VANO, judge. Oral argument held May 12, 2026. Opinion filed June 18, 2026. Reversed.

*Will B. Wohlford* and *Trevor C. Wohlford*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Topeka, for appellants/cross-appellees.

*David C. Bender*, pro hac vice, of Earthjustice, of Madison, Wisconsin, and *Teresa A. Woody*, of Kansas Appleseed Center for Law and Justice, Inc., of Lawrence, for appellees/cross-appellants.

No appearance by appellees/cross-appellee Kansas Corporation Commission and Citizens' Utility Ratepayer Board.

Before MALONE, P.J., ATCHESON, J., and MICHAEL B. BUSER, retired Court of Appeals Judge, assigned.

MALONE, J.:  This case implicates the allocation of authority between federal and state regulation in the electricity market. The federal government has the power to regulate the transmission of electric energy in interstate commerce, including in wholesale ratemaking and interstate and regional planning. But states retain full authority over their own retail distribution systems as well as the safety and reliability of those systems. The practice of demand response—which compensates electricity users for voluntarily reducing their consumption of electricity when supply is scarce—straddles the jurisdictional divide in electricity markets because it entails retail customers entering the wholesale market to sell their non-use of electricity.

Evergy Kansas Central, Inc., Evergy Kansas South, Inc., and Evergy Metro, Inc. (Evergy), applied with the Kansas Corporation Commission (KCC) for approval of certain tariff revisions that Evergy proposed to implement new information gathering requirements for its retail customers who want to participate in demand response programs in wholesale electricity markets. Several parties were allowed to intervene in the KCC proceedings including Sierra Club and Vote Solar. Ultimately, the parties entered into a settlement agreement on the proposed tariff, but Sierra Club and Vote Solar opposed the agreement. The KCC entered an order approving the settlement agreement, and Sierra Club and Vote Solar petitioned for judicial review.

The district court reversed the KCC's settlement order. The district court found Sierra Club and Vote Solar had standing to bring the case. The district court also found the tariff was preempted because it conflicts with federal regulation of demand response programs by adding standards for participation and permits Evergy to withhold consent for retail customers who fail to comply with the information disclosure requirements.

Evergy appeals, arguing the tariff is not preempted by federal law and that Sierra Club and Vote Solar lack associational standing because none of their members would have standing to sue in their own right. Sierra Club and Vote Solar defend the district court's findings on preemption. They cross-appeal and assert the KCC has no authority under Kansas law to regulate retail customer activities in wholesale markets.

After thoroughly reviewing the record and considering the parties' arguments, we reverse the district court's judgment. We agree with the district court that Sierra Club and Vote Solar had standing to appeal the KCC's settlement order. But we disagree with the district court's legal conclusion that the tariff is preempted by federal law. Based on the record presented for our review, we hold the tariff is not preempted by federal law because it does not regulate a field that is entirely occupied by the federal government; it does not make compliance with federal law impossible; and it is not an obstacle to the

4

accomplishment and execution of the full purposes and objectives of the federal regulations governing the use of demand response in the interstate wholesale market.

FACTUAL AND PROCEDURAL BACKGROUND

At the heart of this dispute between Evergy, Sierra Club, and Vote Solar, is the complicated relationship between the wholesale and retail electric markets and what rules and regulations govern the participation of retail electric customers engaging in demand response programs in the wholesale market. The jurisdictional line at issue arises because of the division created by the Federal Power Act (FPA), 16 U.S.C. § 791a et seq., which separates the Federal Energy Regulatory Commission's (FERC) jurisdiction over the interstate wholesale market and the states' jurisdiction over facilities used in intrastate distribution. So before diving into the proceedings of this case, we will try to provide a rudimentary account of electricity markets across the country, the interplay between wholesale and retail markets, and the practice of demand response.

Broadly speaking, the market for electricity in the United States can be divided into two categories:  (1) the *wholesale* market where electricity producers sell electricity to public utilities and power suppliers and (2) the *retail* market where public utilities and power suppliers then sell that electricity to end customers. *FERC v. Electric Power Supply Association*, 577 U.S. 260, 266-67, 136 S. Ct. 760, 193 L. Ed. 2d 661 (2016) (*EPSA*). In 1935, the FPA split jurisdiction over electricity generation and distribution between federal and state governments. The FPA grants FERC the authority to regulate "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce," including both wholesale electricity rates and any rule or practice "affecting" such rates. 16 U.S.C. § 824(b); 16 U.S.C. § 824d(a); 16 U.S.C. § 824e(a). As part of its mandate, FERC is also charged with ensuring that "[a]ll rates and charges" as well as "all rules and regulations affecting or pertaining to

such rates or charges" are just and reasonable. 16 U.S.C. § 824d(a); 16 U.S.C. § 824(b)(1).

The power to regulate "any other sale"—including intrastate retail sales of electric energy (that is, sales directly to users)—rests with state utility commissions. 16 U.S.C. § 824(a), (b); *EPSA*, 577 U.S. at 265-66. In short, while FERC is tasked with overseeing interstate wholesale energy and transmission markets and all rules and practices affecting their prices, state regulators, such as the KCC, are responsible for regulating the in-state retail energy market, which the Supreme Court has described as "a zone of exclusive state jurisdiction." 577 U.S. at 266. The Electric Public Utilities Act (EPUA), K.S.A. 66-101 et seq., gives the KCC "full power, authority and jurisdiction to supervise and control the electric public utilities, as defined in K.S.A. 66-101a, doing business in Kansas," and empowers the KCC to "do all things necessary and convenient for the exercise of such power, authority and jurisdiction." See K.S.A. 66-101 et seq.

While state and local utilities used to control their own power plants, transmission lines, and delivery systems—operating as vertically integrated monopolies in confined geographic areas—the production, transmission, and sale of electric energy is now a competitive interstate industry where electricity flows through an interconnected grid covering nearly the entire country. 577 U.S. at 267. Within this system, FERC has sought to ensure that wholesale electric rates remain reasonable by encouraging competition and "break[ing] down regulatory and economic barriers that hinder a free market in wholesale electricity." *Morgan Stanley Capital Group Inc. v. Public Utility Dist. No. 1 of Snohomish County*, 554 U.S. 527, 536, 128 S. Ct. 2733, 171 L. Ed. 2d 607 (2008).

As part of that effort, FERC established and oversees nonprofit entities called independent system operators (ISOs) and regional transmission operators (RTOs) to manage wholesale markets on a regional basis. *EPSA*, 577 U.S. at 267-68. "Seven such wholesale market operators now serve areas with roughly two-thirds of the country's

electricity 'load' (an industry term for the amount of electricity used)." 577 U.S. at 267. The wholesale market operator covering Kansas is called the Southwest Power Pool (SPP). Each of these wholesale market operators "administers a portion of the grid, providing generators with access to transmission lines and ensuring that the network conducts electricity reliably. . . . And . . . each operator conducts a competitive auction to set wholesale prices for electricity." 577 U.S. at 268.

In *EPSA*, the United States Supreme Court provides an excellent primer that bears quoting at length, explaining the purpose and procedures of these wholesale auctions, as well as the practice at the core of this case, demand response:

> "These wholesale auctions serve to balance supply and demand on a continuous basis, producing prices for electricity that reflect its value at given locations and times throughout each day. Such a real-time mechanism is needed because, unlike most products, electricity cannot be stored effectively. Suppliers must generate—every day, hour, and minute—the exact amount of power necessary to meet demand from the utilities and other 'load-serving entities' (LSEs) that buy power at wholesale for resale to users. To ensure that happens, wholesale market operators obtain (1) orders from LSEs indicating how much electricity they need at various times and (2) bids from generators specifying how much electricity they can produce at those times and how much they will charge for it. Operators accept the generators' bids in order of cost (least expensive first) until they satisfy the LSEs' total demand. The price of the last unit of electricity purchased is then paid to every supplier whose bid was accepted, regardless of its actual offer; and the total cost is split among the LSEs in proportion to how much energy they have ordered. So, for example, suppose that at 9 a.m. on August 15 four plants serving Washington, D.C. can each produce some amount of electricity for, respectively, $10/unit, $20/unit, $30/unit, and $40/unit. And suppose that LSEs' demand at that time and place is met after the operator accepts the three cheapest bids. The first three generators would then all receive $30/unit. That amount is (think back to Econ 101) the marginal cost—*i.e.*, the added cost of meeting another unit of demand—which is the price an efficient market would produce. See 1 A. Kahn, The Economics of Regulation:

7

Principles and Institutions 65-67 (1988). FERC calls that cost (in jargon that will soon become oddly familiar) the locational marginal price, or LMP.

"As in any market, when wholesale buyers' demand for electricity increases, the price they must pay rises correspondingly; and in those times of peak load, the grid's reliability may also falter. Suppose that by 2 p.m. on August 15, it is 98 degrees in D.C. In every home, store, or office, people are turning the air conditioning up. To keep providing power to their customers, utilities and other LSEs must ask their market operator for more electricity. To meet that spike in demand, the operator will have to accept more expensive bids from suppliers. The operator, that is, will have to agree to the $40 bid that it spurned before—and maybe, beyond that, to bids of $50 or $60 or $70. In such periods, operators often must call on extremely inefficient generators whose high costs of production cause them to sit idle most of the time. See Energy Primer 41-42. As that happens, LMP—the price paid by all LSEs to all suppliers—climbs ever higher. And meanwhile, the increased flow of electricity through the grid threatens to overload transmission lines. See *id.*, at 44. As every consumer knows, it is just when the weather is hottest and the need for air conditioning most acute that blackouts, brownouts, and other service problems tend to occur.

"Making matters worse, the wholesale electricity market lacks the self-correcting mechanism of other markets. Usually, when the price of a product rises, buyers naturally adjust by reducing how much they purchase. But consumers of electricity—and therefore the utilities and other LSEs buying power for them at wholesale—do not respond to price signals in that way. To use the economic term, demand for electricity is inelastic. That is in part because electricity is a necessity with few ready substitutes: When the temperature reaches 98 degrees, many people see no option but to switch on the AC. And still more: Many State regulators insulate consumers from short-term fluctuations in wholesale prices by insisting that LSEs set stable retail rates. See *id.*, at 41, 43-44. That, one might say, short-circuits the normal rules of economic behavior. Even in peak periods, as costs surge in the wholesale market, consumers feel no pinch, and so keep running the AC as before. That means, in turn, that LSEs must keep buying power to send to those users— no matter that wholesale prices spiral out of control and increased usage risks overtaxing the grid.

"But what if there were an alternative to that scenario? Consider what would happen if wholesale market operators could induce consumers to refrain from using (and so LSEs from buying) electricity during peak periods. Whenever doing that costs less

8

than adding more power, an operator could bring electricity supply and demand into balance at a lower price. And simultaneously, the operator could ease pressure on the grid, thus protecting against system failures. That is the idea behind the practice at issue here: Wholesale demand response, as it is called, pays consumers for commitments to curtail their use of power, so as to curb wholesale rates and prevent grid breakdowns. See *id.*, at 44-46.

"These demand response programs work through the operators' regular auctions. Aggregators of multiple users of electricity, as well as large-scale individual users like factories or big-box stores, submit bids to decrease electricity consumption by a set amount at a set time for a set price. The wholesale market operators treat those offers just like bids from generators to increase supply. The operators, that is, rank order all the bids—both to produce and to refrain from consuming electricity—from least to most expensive, and then accept the lowest bids until supply and demand come into equipoise. And, once again, the LSEs pick up the cost of all those payments. So, to return to our prior example, if a store submitted an offer not to use a unit of electricity at 2 p.m. on August 15 for $35, the operator would accept that bid before calling on the generator that offered to produce a unit of power for $40. That would result in a lower LMP—again, wholesale market price—than if the market operator could not avail itself of demand response pledges. See ISO/RTO Council, Harnessing the Power of Demand: How ISOs and RTOs Are Integrating Demand Response Into Wholesale Electricity Markets 40-43 (2007) (estimating that, in one market, a demand response program reducing electricity usage by 3% in peak hours would lead to price declines of 6% to 12%). And it would decrease the risk of blackouts and other service problems.

"Wholesale market operators began using demand response some 15 years ago, soon after they assumed the role of overseeing wholesale electricity sales. Recognizing the value of demand response for both system reliability and efficient pricing, they urged FERC to allow them to implement such programs. See, e.g., *PJM Interconnection, L.L.C.*, Order Accepting Tariff Sheets as Modified, 95 FERC ¶ 61,306 (2001); *California Independent System Operator Corp.*, Order Conditionally Accepting for Filing Tariff Revisions, 91 FERC ¶ 61,256 (2000). And as demand response went into effect, market participants of many kinds came to view it—in the words of respondent Electric Power Supply Association (EPSA)—as an 'important element[ ] of robust, competitive wholesale electricity markets.' App. 94, EPSA, Comments on Proposed Rule on Demand Response Compensation in Organized Wholesale Energy Markets (May 12, 2010).

"Congress added to the chorus of voices praising wholesale demand response. In the Energy Policy Act of 2005, 119 Stat. 594 (EPAct), it declared as 'the policy of the United States' that such demand response 'shall be encouraged.' § 1252(f), 119 Stat. 966, 16 U.S.C. § 2642 note. In particular, Congress directed, the deployment of 'technology and devices that enable electricity customers to participate in . . . demand response systems shall be facilitated, and unnecessary barriers to demand response participation in energy . . . markets shall be eliminated.'" *EPSA*, 577 U.S. at 268-72.

Highly simplified, demand response is a reduction in energy consumption in exchange for payment. In practice, demand response is used by operators of wholesale markets that pay retail consumers of electricity for commitments not to use power at certain times to lower wholesale electricity rates and prevent grid breakdowns. See 18 C.F.R. § 35.28(b)(4) ("Demand response means a reduction in the consumption of electric energy by customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy."). Even more simplified, when the temperature is 98 degrees and consumers are using their air conditioning systems to full capacity, demand response programs are what helps prevent the electric grid from shutting down.

Demand response operates within the regular auctions for electricity in federal interstate wholesale markets, which are run by operators such as SPP, by allowing retail customers to submit bids to decrease their electricity consumption by a set amount at a set time for a set price when doing so is more efficient than increasing electricity generation. That is, customers in retail markets sell their non-use of electricity back onto the wholesale market. Because an individual retail consumer would only represent a drop in the bucket, aggregators of multiple users of electricity typically coordinate demand response by aggregating multiple retail consumers' demand response bids—their agreements to use less electricity at a given time—into one collective bid, which the aggregator then submits in federal wholesale market auctions. 577 U.S. at 270-72.

10

Demand response does not fit neatly into the jurisdictional boundaries between wholesale and retail markets. By its very nature, demand response is not a sale for resale of electricity, which is the case in the rest of wholesale market where producers sell electricity to suppliers who then sell to end consumers. Demand response is not really a sale of electricity at all—demand response is the sale of non-use of electricity, where the entities selling are typically ordinary retail purchasers. See Christiansen & Macey, *Long Live the Federal Power Act's Bright Line*, 134 Harv. L. Rev. 1360, 1377 (2021).

In 2008, in an attempt to promote wholesale demand response programs, FERC issued Order No. 719, "which (among other things) requires wholesale market operators [i.e., RTOs' and ISOs such as SPP] to receive demand response bids from aggregators of electricity consumers, except when the state regulatory authority overseeing those users' retail purchases bars such demand response participation." *EPSA*, 577 U.S. at 272. That order is now codified in 18 C.F.R. § 35.28(g)(1). FERC included an opt-out provision allowing the states and relevant electric retail authorities to prohibit retail customers from participating in wholesale markets through aggregations of demand response resources. See 18 C.F.R. § 35.28(g)(1)(iii). FERC required wholesale operator ISOs and RTOs to grant access to third-party "aggregator[s] of retail customers (ARC)," except where "the laws or regulations of the relevant electric retail regulatory authority do not permit the customers aggregated [by the ARC] to participate." FERC Order No. 719, ¶ 155.

Several years later, in Order No. 745—the subject of the litigation in *EPSA*—FERC sought to further break down barriers to demand response in wholesale markets by requiring that demand response resources receive compensation equivalent to traditional generators for the wholesale market services they provide. 577 U.S. at 272-76. That is, FERC required demand response resources be paid the same rate as would a generator of the equivalent amount of electricity. Because demand response does not actually involve a wholesale sale of electricity, FERC justified its authority under its power to regulate practices "affecting" wholesale rates. Ultimately, the United States Supreme Court upheld

11

Order No. 745, concluding FERC has jurisdiction over practices "'directly affect[ing] the wholesale rates,'" including participation and compensation of demand response in wholesale markets, even if its regulations impact the retail market. 577 U.S. at 276-78. The Court also held that FERC's regulation of demand response in wholesale markets is lawful, even if the regulation has an impact on retail rates, so long as its regulation stops short of regulating the actual retail rate itself. 577 U.S. at 277-82. Remarking on the overlap of the federal and state spheres of jurisdiction, the *EPSA* Court commented:

> "It is a fact of economic life that the wholesale and retail markets in electricity, . . . are not hermetically sealed from each other. To the contrary, transactions that occur on the wholesale market have natural consequences at the retail level. And so too, of necessity, will FERC's regulation of those wholesale matters." 577 U.S. at 281.

This jurisdictional entanglement works both ways—the States maintain their traditional authority over intrastate electricity issues and may regulate in ways which impact wholesale energy rates, so long as the state does not attempt to directly regulate the wholesale market or prevent FERC from executing its mandate over interstate wholesale markets. With at least some picture of the overlapping jurisdiction of federal and state regulators over electricity markets in hand, we turn our attention to the parties and the proceedings giving rise to this case.

*Evergy's Tariff Application*

On January 25, 2023, Evergy filed an application with the KCC requesting regulatory approval of certain tariff updates related to retail customer participation as demand response resources in SPP's regional wholesale market through demand response aggregators. In the context of public utilities, a tariff means the "terms and conditions which govern the relationship between the utility and its customers. Public utilities in this state are required to file their tariffs with the KCC. K.S.A. 66-101c." *Grindsted Products, Inc. v. Kansas Corporation Comm'n*, 262 Kan. 294, 309, 937 P.2d 1 (1997).

12

In its application, Evergy explained that it was seeking "to put in place a simple, transparent and consistent framework to process [Southwest Power Pool] demand response registrations and improve visibility into wholesale demand response participation in Kansas." Evergy asserted that its proposal would help it to more efficiently review demand response registrations; clarify the obligations of itself, the demand response aggregators, and retail customers seeking to participate in the wholesale demand response market; provide Evergy with more data on demand response activities to better allow it to address potential operational, resource adequacy and load-forecasting challenges; leave an appropriate oversight role for KCC; and ensure the safety and reliability of the electric distribution grid for all of its customers.

Evergy's application proposed three specific updates to the tariff: (1) include a definition of "Demand Response Aggregator" (DRA), (2) require retail customers seeking to participate in regional wholesale markets as demand response resources to complete certain registration requirements, including a Customer Registration and Consent Form (Customer Form), and (3) limit the participation of retail customers in SPP's markets to only be through an approved aggregator of retail customers that maintained a standing distribution-utility agreement with Evergy. As to the second update, concerning retail customer registration requirements, Evergy also requested the addition of "certain terms that the retail customer and DRA jointly acknowledge and to which they agree, including that Evergy's consent is required for the retail customer's wholesale market participation." The third proposed update would have effectively prohibited Evergy customers from working with any demand response aggregator that did not have an ongoing agreement or contract with Evergy.

Several parties were allowed to intervene in the KCC proceedings including the Citizens' Utility Ratepayer Board (CURB), the Empire District Electric Company, Voltus, Inc., the Southern Pioneer Electric Company, and the Sunflower Electric Power Company. Sierra Club and Vote Solar also jointly petitioned to intervene. In the petition,

13

Sierra Club described itself as a national organization advocating "for robust renewable energy and energy efficient investments that produce safe and sustainable jobs." Vote Solar described itself as "a non-profit grassroots organization working to foster economic opportunity by bringing solar and energy storage into the mainstream."

Sierra Club and Vote Solar argued that the proposed tariff "would indirectly regulate ARCs by mandating that customers file forms with Evergy before participating in demand response and that ARCs enter contracts with Evergy before registering demand response resources . . . ." In other words, they contended that their members who wanted to participate in demand response through an ARC would be directly impacted by Evergy's proposed tariff and that the tariff improperly imposed regulations in the wholesale market. The KCC granted Sierra Club and Vote Solar's intervention.

Initially, Voltus, which operates as an aggregator of retail customers in the SPP, also opposed Evergy's proposed tariff. Comments from various Voltus employees raised a variety of concerns including that Evergy's proposed tariff updates were outside of KCC's jurisdiction to approve and that the proposed revisions impermissibly gave Evergy control over their federally regulated activities as an aggregator of retail customers selling demand response onto the wholesale market. The principal concern of Voltus was the proposed tariff's attempt to regulate demand response aggregators, such as itself—not the informational requirements proposed for the retail customers themselves. But after settlement discussions, Voltus reached an agreement with Evergy to amend the proposed tariffs by removing the requirement that Evergy have contracts with the aggregators.

CURB—the board that serves as the official consumer advocate for residential and small commercial utility ratepayers—generally supported Evergy's tariff application. In comments to the KCC's staff report and recommendation, a CURB representative stated:

14

"CURB agrees with Evergy that Evergy's present tariffs should be revised given the potential for growth of DR [demand response] Resources in the SPP marketplace. In these regards, CURB generally believes it to be in the public interest and beneficial to Kansas residential and small commercial ratepayers to provide, in the pertinent tariffs, the terms and conditions by which the consent of Evergy can be obtained with respect to customer participation in the SPP marketplace through demand response.

. . . .

"CURB believes that Kansas is best served by some state regulatory mechanism governing reasonable entry of DR Resources into the SPP marketplace. CURB perceives that access of DR Resources in SPP potentially benefits residential and small commercial ratepayers through the reduction of wholesale electricity costs."

*The Non-Unanimous Settlement Agreement*

On August 10, 2023, all the parties to the KCC proceedings, except for Sierra Club and Vote Solar, filed a "Joint Motion to Approve Non-Unanimous Settlement Agreement." Evergy, Voltus, CURB, and KCC Staff each filed testimony in support of the settlement agreement. As amended in the non-unanimous settlement agreement, the proposed tariff no longer required a demand response aggregator, such as Voltus, to enter into agreements with Evergy before they were allowed to participate in providing wholesale market services. The proposed updates to the tariff were included as attachments to the settlement agreement.

The changes, which appeared as redline additions to the prior version of the tariff, included the addition of a definition: "'Demand Response Aggregator' means a third-party entity that aggregates the load of one or more Customers for purposes of participation as demand response in the SPP Integrated Marketplace." The tariff also included a delineation of the information a customer would need to provide to obtain Evergy's consent to participate in the SPP's Integrated Marketplace. The prior tariff had merely stated that Evergy's consent was required for a customer to participate in demand response, without setting forth the particular information and registration forms they

15

would need to provide. The settlement agreement also contained the various retail customer registration and consent forms and schedules.

Sierra Club and Vote Solar opposed the agreement, arguing (1) that KCC lacked the statutory authority to regulate customer participation in wholesale markets; (2) that the tariffs are preempted by the FPA because they are aimed at activities in the wholesale market—specifically, retail customers' participation in the wholesale market; and (3) that the non-unanimous settlement agreement would not result in just and reasonable rates. They accused Evergy of seeking "anti-competitive advantages by exploiting their control of the distribution system to control customer participation in wholesale markets." Moreover, they noted that the only difference between Evergy's initially proposed tariffs and those included in the non-unanimous settlement agreement "is that it quashes [demand response] competition by regulating consumers rather than third-party aggregators." In other words, they complained that the tariff created "a state-level approval process and regulatory regime" that customers would have to navigate before registering with the FERC approved registration mandated by the SPP.

*KCC's Settlement Order*

On October 24, 2023, the KCC entered an order approving the non-unanimous settlement agreement. First, the order addressed, and rejected, Sierra Club and Vote Solar's objection that the KCC lacked authority under Kansas law to regulate demand response. Second, the order rejected Sierra Club and Vote Solar's objection that the settlement agreement was preempted by federal law.

On the first point, KCC concluded that "it has broad powers to supervise and control electric public utilities, and that inherent in those broad powers is the ability to regulate aspects of the relationship between the [KCC] and its customers." The order conceded that Sierra Club and Vote Solar were correct that it had no "power to tell

16

consumers when or how to use electricity," but explained "there is a difference between a customer's decision to turn the lights off and a decision to turn the lights off in a coordinated fashion with other customers in order to have a substantial effect on the capacity and by extension, safety of the grid." The KCC emphasized that its approval of Evergy's tariff did not seek to aid any anti-competitive behavior on behalf of Evergy or to impact and influence customer participation in providing demand response in the wholesale market. Rather, the KCC reasoned, "[t]he Settlement primarily focuses on coordination and information sharing between Evergy and [demand response aggregators], creating more efficient and reliable implementation of [demand response aggregator] activities in Kansas." The KCC concluded the tariff's focus "on coordinated, efficient, and reliable implementation is well within the bounds of state jurisdiction."

Turning to preemption, the KCC emphasized the dual role of federal and state regulation in the field of demand response, highlighting that the matter was at "'the confluence of state and federal jurisdiction.'" The KCC summarized the issue as follows:

> "Both FERC and the [United States] Supreme Court have recognized that there is a role for state regulation in [demand response] and that the limit of the state's power is the state may not attempt to regulate wholesale rates. The only question left to the [KCC] is whether Evergy, through the tariff revisions found in the proposed settlement agreement, is attempting to regulate wholesale rates under the guise of safety and reliability."

Ultimately, the KCC concluded that the tariff was not preempted because it was not aimed at impacting intrastate wholesale market rates or regulating participation in the wholesale market. The KCC highlighted Evergy's statements that the intent of its tariff update was to "ensure the safety and reliability of the grid," not "to bar participation in wholesale markets." The KCC's analysis on the preemption issue focused heavily on the tariff's requirement that Evergy provide consent to a consumer's participation in demand response. The order explained that the updated tariff was merely an "improvement upon the current tariff," which already provided that Evergy's written consent was necessary

17

before a customer could participate in the SPP's integrated market or with a demand response aggregator. The KCC found the tariff was not preempted because it was trying to regulate participation in the wholesale demand response market but was aimed at providing a "process . . . for coordination and information sharing to protect Evergy's equipment and ensure continued reliability of the grid." The order concluded:

> "The [KCC] finds that the Non-Unanimous Settlement Agreement conforms with applicable law under the [KCC's] powers to supervise electric public utilities as the proposed tariff revisions are not aimed at wholesale market rates or participation, rather they are a means by which Evergy and the [KCC] fulfill their duties to protect the safety and reliability of the grid."

After finding that it had the authority to approve the tariff and that the tariff was not preempted, the order concluded that the settlement agreement would result in just and reasonable rates and that it was in the public interest. Sierra Club and Vote Solar petitioned for reconsideration, which the KCC denied.

On January 5, 2024, Sierra Club and Vote Solar petitioned for judicial review. In their petition, Sierra Club and Vote Solar reraised the concerns they had brought before the KCC, challenging the KCC's statutory authority to approve the settlement agreement, that the settlement agreement was not supported by substantial competent evidence, and that the order was preempted by federal law. The petition asserted that "[KCC's] decisions imposed unlawful impediments to competitive federal markets for clean energy, which exceeds the KCC's statutory authority and oversteps into exclusive federal jurisdiction."

*The District Court's Order*

On September 18, 2024, relying on the parties' briefing without holding an oral argument, the district court entered its memorandum decision, reversing KCC's order and

concluding that the updated tariff was preempted by federal law. The decision identified three issues for review: (1) Whether the KCC acted beyond the jurisdiction conferred by any provision of law when it approved the non-unanimous settlement agreement; (2) whether the decisions of the KCC were preempted by federal law; and (3) whether Sierra Club and Vote Solar had standing to bring the case. The district court swiftly dealt with the first and third issues, with the bulk of its order focusing on the issue of preemption and the jurisdictional divide between federal and state regulation.

The district court first found that Sierra Club and Vote Solar had standing because their members "have interests clearly adverse to [Evergy]." The district court noted that the parties agreed that Sierra Club and Vote Solar had statutory standing because they had participated in the proceedings before the KCC. Turning to common-law standing, the district court concluded that Sierra Club and Vote Solar had associational standing because "the tariff imposes unlawful barriers to [their members'] participation in the federally regulated wholesale electricity market" and "makes participation in demand response programs more burdensome to them than lawfully allowed."

The district court swept away Sierra Club and Vote Solar's challenge to whether the KCC lacked authority under Kansas law to regulate the activities of customers wanting to engage in demand response, commenting that their argument "sounds like semantics." The district court reasoned that "[t]he KCC has authority to regulate the relationship between the utilities and their customers. If a utility is authorized to do certain acts with relation to its customers, then the customers' compliance is necessarily within the purview of the regulation." Although the district court would later observe that the KCC had perhaps impermissibly delegated its authority and abdicated its oversight role to Evergy through the tariff, it concluded the KCC had the authority to pass the tariff to ensure the safety and reliability of the electric grid in Kansas.

19

Turning to the preemption analysis, the district court considered Sierra Club and Vote Solar's arguments that KCC's approval of the tariff was (1) field preempted—because the federal government has so comprehensively legislated in the area of wholesale electric energy markets, there is no room for the KCC's tariff order—and (2) conflict preempted—because the KCC's order actually conflicts with the purpose and objective of federal law. The district court began by addressing field preemption and concluded that "[t]he federal government does not 'occupy the field' in electric energy as it relates to state interests." In reaching this conclusion, the court explained that in *EPSA*, 577 U.S. at 267, the United States Supreme Court explicitly held that the states have authority to regulate the retail sale of electricity within their territories—that is, over issues involving intrastate electricity and the safety and reliability of their own grid. The district court added that despite FERC's mandate to eliminate barriers to participation in demand response programs in the wholesale market, FERC permits states to opt out of demand response programs entirely. And the district court recognized the state's role in the inextricably linked wholesale and retail markets:

> "FERC does note that states retain some authority over distributed energy resources that participate in the wholesale markets limited to retail rates, their distribution system, its planning, operation, and reliability as well as siting, and interconnection. Safety of the state infrastructure and the local distribution grids are always local concerns and responsibilities within the state's domain."

The district court found that "[b]ecause FERC has considered conflicts with state regulatory agencies in the context of managing electrical energy running through local transmission grids, the court cannot conclude that FERC, as the federal government, has chosen to occupy the field." In short, the district court concluded that there are certain state interests, such as grid reliability and safety, which are well within the purview of state regulation, so long as they do not regulate intrastate wholesale markets.

The district court then turned its analysis to the doctrine of conflict preemption. In determining whether the KCC's order impermissibly conflicted with federal law, the district court stated, "The question in this case is whether the tariff, . . . attempts to regulate the wholesale market or interferes with FERC in its regulation of that market and their associated [demand response] programs." To answer this question, the district court looked chiefly to (1) the federal laws regulating wholesale markets and policies intended to foster participation in wholesale demand response and (2) the language and terms of the updated tariff as approved by the KCC, focusing on their potential effect on the wholesale market, rather than the intent behind them.

The district court recognized the importance of Evergy having information about the retail consumers who would be bidding their demand response into the wholesale market—the stated purpose of the updated tariffs. Despite the importance of "the need for full accurate and timely information . . . in the delivery of the energy service," the district court concluded that several aspects of the tariff went too far, granting Evergy too much authority over who could participate in the wholesale market, and thus conflicted with federal goals and policies regarding demand response.

First, the district court found that the tariff gave Evergy too much power to interfere in the wholesale market by giving it "the unfettered authority to delay and then withhold a customer's wholesale market [demand response] participation consent and even to withdraw its consent." Second, the district court objected that the tariff did not clearly delineate what information consumers would be required to give to Evergy. The district court perceived a tension between the stated purpose of the tariff—to require the disclosure of necessary information from customers providing demand response to ensure the safety and reliability of the electric grid—and the potential for misuse by Evergy, allowing the company the ability to indiscriminately bar customers from participating in demand response. The district court explained:

21

"If the tariff is read as allowing denial of participation in the wholesale DR market—by Evergy objecting within the SPP forum—for the customer failing to provide specific information by a reasonable and certain date, then that would appear to be justified under recognized valid KCC and Evergy concerns for planning and safety. However, if the denial could be dependent upon ill-defined additional terms subject to change at Evergy's discretion, that would require more KCC oversight than specified, and more facts to support a justification that are not seen in the current record, then it conflicts with federal regulation of the interstate wholesale electricity market. It is unclear and misleading in its current form."

While the court seemed to believe that the aim of the tariff was not constitutionally preempted if it only collected specific information at a reasonable time, it concluded that the means by which the tariff achieved its goals ran afoul of federal regulation of the wholesale energy market. As a result, the district court reversed the KCC's settlement order and granted judgment for Sierra Club and Vote Solar.

Evergy timely appealed the district court's judgment. Evergy first claims the district court erred in finding that Sierra Club and Vote Solar had standing to challenge the KCC's settlement order. Next, Evergy claims the district court erred in finding the KCC's order approving the tariff is preempted by federal law. Sierra Club and Vote Solar cross-appeal and argue that the KCC lacks authority under Kansas law to regulate retail customer activities in wholesale markets. We will address each issue in turn.

SIERRA CLUB AND VOTE SOLAR HAVE STANDING

Evergy contends the district court erred by misapplying the associational standing test to conclude that Sierra Club and Vote Solar had established common-law standing. Evergy argues Sierra Club and Vote Solar failed to provide facts sufficient to show that at least one of their members had standing to seek judicial review of the KCC's order approving the updated tariff. Sierra Club and Vote Solar maintain that the district court

correctly found that they had standing because the implementation of the tariff against their members, whenever they enter the demand response market, is a cognizable injury.

It is well settled that "parties in a judicial action must have standing as part of the Kansas case-or-controversy requirement imposed by the judicial power clause of article 3, § 1 of the Kansas Constitution." *Sierra Club v. Moser*, 298 Kan. 22, 29, 310 P.3d 360 (2013). As standing is a component of subject matter jurisdiction, it may be raised by any party, or the court on its own motion, at any time. 298 Kan. at 29. And "[b]ecause standing implicates the court's jurisdiction to hear a case, the existence of standing is a question of law over which this court's scope of review is unlimited." *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 751, 189 P.3d 494 (2008).

There are two components to any standing analysis: (1) statutory standing and (2) common-law or traditional standing. Here, the district court held that Sierra Club and Vote Solar had statutory standing because they were parties to the proceedings before the KCC. Evergy does not dispute that Sierra Club and Vote Solar have statutory standing.

The focus of Evergy's claim that the district court erred by granting Sierra Club and Vote Solar judicial review is on common-law standing. The district court found that Sierra Club and Vote Solar had common-law standing because "the tariff imposes unlawful barriers to [their members'] participation in the federally regulated wholesale electricity market" and "makes participation in demand response programs more burdensome to them than lawfully allowed." The district court summarized its analysis by stating that it believed Sierra Club and Vote Solar had standing because their members "have interests clearly adverse to [Evergy]."

The traditional test for common-law standing requires a person bringing the lawsuit to both show a cognizable injury and establish a causal connection between the injury and the challenged conduct. But when, as here, an organization is suing on its

23

members' behalf, it must establish *associational* standing via a three-pronged test, showing (1) that at least one of its members would have standing to sue in their own right, (2) that the interests it seeks to protect are germane to the organization's purpose, and (3) that neither the claim asserted nor the relief requested requires participation of individual members. *Moser*, 298 Kan. at 33. Evergy concedes that Sierra Club and Vote Solar satisfied both the second and third prongs of this test. But it maintains the district court misapplied the first requirement because "an association does not obtain standing merely by asserting interests adverse to the interests of other parties."

To satisfy the first prong of the associational standing test, Sierra Club and Vote Solar must show "'one of [their] members has suffered actual or threatened injury—i.e., the association or one of its members must have suffered cognizable injury or have been threatened with an impending, probable injury and the injury or threatened injury must be caused by the complained-of act or omission.'" *Kansas National Education Association v. State*, 305 Kan. 739, 747, 387 P.3d 795 (2017) (*KNEA*). To prove a cognizable injury, "'a party must establish a personal interest in a court's decision and that he or she personally suffers some actual or threatened injury as a result of the challenged conduct.'" *Gannon v. State*, 298 Kan. 1107, 1123, 319 P.3d 1196 (2014). Mere allegations of possible future injury do not meet the requirements of standing—any threatened injury must be impending. *Moser*, 298 Kan. at 33.

As Evergy points out, the district court did not explicitly state that it found that Sierra Club and Vote Solar showed that at least one of their members had standing in their own right. But the district court did appear to conclude that the members of Sierra Club and Vote Solar asserted that the tariff would result in unlawful barriers to their participation in the wholesale demand response market and made their participation in such programs more burdensome. By concluding that Sierra Club and Vote Solar had associational standing, the district court presumably found that their members would suffer cognizable injuries because the tariff would directly impact them by imposing

24

increased informational and reporting requirements and potentially making it harder for them to participate in wholesale demand response programs.

Evergy suggests that this court's standing inquiry must be determined from the record before the KCC and is limited to the KCC's factual findings regarding Sierra Club's and Vote Solar's members' injuries. But the Kansas Supreme Court has held that "a petitioner may rely on the administrative record or may file affidavits or declarations with a court to establish standing of a party seeking judicial review of an agency action." *Moser*, 298 Kan. at 39. Both Sierra Club and Vote Solar supplemented the administrative record with affidavits and declarations from their members explaining their interests involved in the lawsuit. We agree with Sierra Club and Vote Solar that these sources, produced before the district court, may be considered as evidence of their standing.

In their petition, Sierra Club and Vote Solar conceded that none of their members actively participated in a demand response program, explaining that their "members in Kansas are *likely to participate* in competitive demand response activities as more [aggregators of retail customers] operate in Kansas and expand programs for residential and small commercial customers." (Emphasis added.) They argued their members' ability to participate in demand response through ARCs would be directly impacted by the tariff's increased informational requirements and that their electricity rates would be higher because the tariffs would dissuade ARCs from operating in Kansas.

The declarations and affidavits submitted before the district court included declarations from one Kansas-based member of Vote Solar and three Kansas-based members of Sierra Club—the Vote Solar member is a member of both organizations. None of Sierra Club's and Vote Solar's members actively participates in a demand response program. That said, each of them proclaimed that they intended to join a demand response program when given the opportunity to do so. Two of the members expressed that the tariff's reporting and information requirements would be "burdensome"

25

and stifled their desire to participate. The other member proclaimed that "Evergy's proposed demand response tariffs and the intrusive reporting scheme would prevent me from participating" and "would be a gross invasion of my privacy and a waste of my time." The members also speculated that the tariff would lead to less participation in demand response programs across the state, which would in turn lead to higher electricity prices.

On appeal, Sierra Club and Vote Solar claim: (1) their members are "directly burdened by the additional requirements and impediments the tariffs pose to their intended participation in wholesale markets"; (2) their "members suffer a competitive injury from the tariff's favorable treatment of Evergy over consumers who provide wholesale market demand response"; and (3) their "members are harmed as electricity consumers" because the tariff has the potential to increase the price of electricity by driving down participation in demand response programs.

Because Sierra Club and Vote Solar concede that their members are not currently seeking to participate in the demand response market, their associational standing depends on whether their members face an imminent injury if and when they do begin to participate. They contend their members' cognizable injury is their potential decision not to participate in demand response because of the updated tariff and the increased requirements they will be subject to if they do participate: "[I]t is not necessary that Petitioners' members currently provide demand response to wholesale markets. It is sufficient that they would be subject to the tariffs if they engaged in the regulated activity." Evergy responds that these alleged injuries are not imminent and are speculative and imaginary because the members are not currently enrolled in a wholesale demand response program—therefore, Evergy reasons, they are not justiciable.

The Kansas Supreme Court has held that "[a] cognizable injury need not be current—our cases recognize that an '"impending, probable"' future harm can suffice."

26

*POM of Kansas, LLC v. Kobach*, 319 Kan. 764, 769-70, 561 P.3d 506 (2024). And "[w]hether a future harm is 'impending' and 'probable' turns on case-specific circumstances rather than any categorical rule." 319 Kan. at 770.

Although Sierra Club's and Vote Solar's members are not currently affected by the tariff, they would be as soon as they participate in a wholesale demand response program. Thus, their concerns are not merely speculative—if these members enter the demand response market, they will be subject to the informational and reporting requirements of the updated tariff. As Sierra Club and Vote Solar point out, "their decision not to participate until the tariffs' burdens are lifted *is* an injury that confers standing." In other words, their members are the object of the tariff because the updated terms of the tariff would directly regulate their participation in wholesale markets. Because the additional information they would be required to provide is the object of the tariff, a judgment in their favor would address their alleged injury. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

In its reply brief, Evergy asserts: "Currently, there is no ARC that aggregates residential customer loads in Kansas; nor is one imminently expected to start operating in the state." But Evergy cites nothing in the record to support this statement.

Because both Sierra Club and Vote Solar produced evidence from at least one of their members suggesting that they face an imminent and particularized injury by being subjected to the terms of the updated tariff, they have established standing. Although the injury that Sierra Club's and Vote Solar's members would suffer upon their participation in a wholesale demand response program effectively amounts to increased paperwork, it is sufficient to find that they have common-law standing. We conclude the district court did not err in finding Sierra Club and Vote Solar established associational standing.

27

Before we address the district court's ruling on preemption, we note that Evergy has raised a separate issue contending the district court improperly expanded the scope of its review under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., when it made comments about the KCC appearing to abdicate its oversight responsibility by giving Evergy too much authority in the tariff and that the KCC did not make adequate factual findings about the substance of the tariff. Despite its framing of the matter as a separate issue, Evergy is not asking for this court to review and correct any particular error. Evergy appears to simply be asserting that the district court should not have considered these matters in its order but neither of these issues appears to have determined the outcome of the case. The district court's decision reversing the KCC's order depended on its preemption analysis; to the extent the district court made additional observations allegedly outside the scope of its review under the KJRA, those observations did not affect its conclusion that the tariff was preempted. These arguments—that the district court improperly relied on an "abdication" theory and made an assessment that KCC's factual findings on the tariff were lacking—are more properly addressed in the discussion and analysis of the preemption issues.

THE KCC'S SETTLEMENT ORDER WAS NOT PREEMPTED BY FEDERAL LAW

Evergy claims the district court erred by finding that the KCC's settlement order was preempted by federal law. First, Evergy contends the tariff is not field preempted because federal regulations over the wholesale electricity market do not cover rules between individual customers seeking to enter the demand response market and their aggregators. Second, Evergy argues the tariff does not directly conflict with federal law to an extent making compliance with both federal and state law impossible, nor does the tariff stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress with regard to demand response in the wholesale market.

28

Sierra Club and Vote Solar defend the district court's reasoning, arguing the updated tariff in the settlement order (1) intrudes on the federal government's exclusive jurisdiction to regulate wholesale electricity markets and (2) conflicts with the federal government's policies limiting the burdens and restrictions that can be placed on participation in wholesale demand response markets.

An issue involving preemption presents a question of law over which an appellate court exercises unlimited review. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 940, 296 P.3d 1106 (2013).

The Supremacy Clause of the United States Constitution provides the foundation for the doctrine of preemption; it provides:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof, . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

In short, the Supremacy Clause "invalidates state laws that interfere with, or are contrary to, federal law" and "has led to recognition that federal law may supersede state law in several different ways." *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 294, 255 P.3d 1186 (2011). The different forms of preemption have led to the development of different analytical categories:

> "Broadly speaking, a preemption analysis divides into two principal categories: express and implied preemption. Implied preemption is further divided into two analytical subcategories:  field preemption and conflict preemption. Then, yet a third strata of analytical subcategories is used when examining claims of conflict preemption: per se conflict and obstacle preemption." 292 Kan. at 294.

29

Express preemption occurs, as its name suggests, where Congress expressly states its intention to preempt state law through legislation. *Pacific Gas & Electric Co. v. Energy Resources Comm'n*, 461 U.S. 190, 203, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983) ("It is well-established that within Constitutional limits Congress may preempt state authority by so stating in express terms."); see *Powerback Rehabilitation v. Kansas Dept. of Labor*, 321 Kan. 236, 239-40, 576 P.3d 843 (2025) (noting that courts "will find an express preemption only when federal law explicitly uses words like 'supersede,' 'preempt,' or 'preemption,' or directly prohibits a state from applying a certain type of law"). Neither party contends that the regulation at issue is expressly preempted.

Absent explicit preemptive language, Congress' intent to supersede state law may be inferred because "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947). Similarly, the Kansas Supreme Court has held that absent an express statement of Congress that state law is preempted, preemption occurs where there is an actual conflict between federal and state law; where compliance with both federal and state law is, in effect, physically impossible; where Congress has occupied the entire field of regulation and leaves no room for states to supplement federal law; or when state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Doty v. Frontier Communications, Inc.*, 272 Kan. 880, Syl. ¶ 4, 36 P.3d 250 (2001).

The United States Supreme Court has identified two varieties of implied preemption: field preemption and conflict preemption. Field preemption occurs where a scheme of federal regulation is "'so pervasive as to make reasonable the inference that

30

Congress left no room for the States to supplement it.'" *Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta*, 458 U.S. 141, 152-53, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982). Conflict preemption occurs where state law or action directly conflicts with federal law such that it makes compliance with both federal and state law impossible or "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Pacific Gas & Electric*, 461 U.S. at 204.

The district court's memorandum decision reversing the KCC's settlement order approving the tariff did not clearly delineate the rules and analysis for the varieties of preemption. It appears that the district court found that field preemption did not apply, although Sierra Club and Vote Solar do not read the district court's order as a complete rejection of field preemption. The heart of the district court's decision was that the tariff was conflict preempted because it set different standards for participation in the wholesale market than imposed under federal regulation and gave Evergy the power to decide whether customers could participate in the wholesale energy market. That said, Sierra Club and Vote Solar argue on appeal that the tariff is field preempted and conflict preempted, and Evergy argues that the tariff is neither field preempted nor conflict preempted. As a result, we will address both forms of preemption.

*Field Preemption*

As for whether the tariff is field preempted, Evergy argues "there has been no showing that federal jurisdiction attaches to transactions between individual demand response resources and their aggregators." That is, Evergy takes the position that the federal regulations on the wholesale demand response market only apply to aggregators of demand response, not individual customers and distributed energy resources (DERs) attempting to sell their demand response through those aggregators. Sierra Club and Vote Solar counter that Evergy's "tariffs regulate the act of participating in the wholesale power market, which is a field exclusively occupied by the federal government."

31

Field preemption surfaces where "Congress has forbidden the State to take action in the *field* that the federal statute preempts," *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377, 135 S. Ct. 1591, 191 L. Ed. 2d 511 (2015), or where Congress legislates an area so broadly there is "no room for the States to supplement federal law." *Northwest Cent. Pipeline v. Kan. Corp. Comm'n*, 489 U.S. 493, 509, 109 S. Ct. 1262, 103 L. Ed. 2d 509 (1989). The core question in a field preemption analysis is whether the "scheme of federal regulation" is "'so pervasive as to make reasonable the inference that Congress left no room to supplement it.'" *Pacific Gas & Electric*, 461 U.S. at 204. "'[T]he purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150, 163, 136 S. Ct. 1288, 194 L. Ed. 2d 414 (2016). "A state law is preempted where 'Congress has legislated comprehensively to occupy an entire field of regulation[.]'" 578 U.S. at 163.

Evergy argues this court should apply a presumption against any finding of preemption. The Kansas Supreme Court has stated that "'[i]n the absence of express preemption, there is a strong presumption that Congress did not intend to displace state law.'" *Doty*, 272 Kan. at 891. That said, "the presumption does not apply if the area of regulation is one where the interests at stake are 'uniquely federal' in nature." *Board of Miami County Comm'rs*, 292 Kan. at 296. Here, the interest or field at stake is the interstate wholesale market for electricity, an area that is uniquely federal with the creation of FERC. Thus, we decline to apply a presumption against preemption.

As noted earlier, the United States Supreme Court has described the statutory scheme for the regulation of energy markets under the FPA as an example of "cooperative federalism." *EPSA*, 577 U.S. at 288. The interconnected nature of wholesale and retail rates and practices has led to frequent jurisdictional tension. 577 U.S. at 265 ("Th[e] statutory division generates a steady flow of jurisdictional disputes because—in point of fact if not of law—the wholesale and retail markets in electricity are inextricably linked."). Disentangling these linked markets to determine a regulation or state-law

32

claim's target is the crux of a preemption analysis. *Oneok*, 575 U.S. at 385 (explaining that Supreme Court precedents "emphasize the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted").

Despite the interconnection between wholesale and retail practices, there are areas completely reserved to either the federal or state regulation: "Under the FPA, FERC has exclusive authority to regulate 'the sale of electric energy at wholesale in interstate commerce.'" *Hughes*, 578 U.S. at 154; see 16 U.S.C. § 824(b)(1). The FPA "allocates to FERC exclusive jurisdiction over 'rates and charges . . . received . . . for or in connection with' interstate wholesale sales. [16 U.S.C.] § 824d(a)." 578 U.S. at 163; *EPSA*, 577 U.S. at 288 ("The FPA 'leaves no room either for direct state regulation of the prices of interstate wholesales' or for regulation that 'would indirectly achieve the same result.'"). "But the law places beyond FERC's power, and leaves to the States alone, the regulation of 'any other sale'—most notably, any retail sale—of electricity." *EPSA*, 577 U.S. at 264.

In *Hughes*, the United States Supreme Court dealt with the issue of field preemption under the FPA, finding that a Maryland energy program was preempted because it impermissibly "set[] an interstate wholesale rate, contravening the FPA's division of authority between state and federal regulators." 578 U.S. at 163. Although the details of Maryland's program are not important to this case, the regulation at issue set terms and prices for wholesale electricity that were different than those sanctioned by FERC. 578 U.S. at 155-62. In short, the Supreme Court concluded that the Maryland program "adjust[ed] an interstate wholesale rate"—an area, or field, where FERC has the exclusive authority to regulate—and was therefore preempted. 578 U.S. at 163. *Hughes* expressly noted the limited nature of its ruling, explaining:

> "We reject Maryland's program only because it disregards an interstate wholesale rate
> required by FERC. We therefore need not and do not address the permissibility of various
> other measures States might employ to encourage development of new or clean

33

generation, including tax incentives, land grants, direct subsidies, construction of state-owned generation facilities, or re-regulation of the energy sector. *Nothing in this opinion should be read to foreclose . . . other States from encouraging production of new or clean generation through measures 'untethered to a generator's wholesale market participation*.'" (Emphasis added.) 578 U.S. at 166.

The question is whether the tariff approved by the KCC created an impermissible tether to a customer's participation in the wholesale market—that is, does the tariff attempt to regulate the wholesale market—which under the holding in *Hughes*, 578 U.S. at 166, is not permissible. The retail customer registration and consent forms that Evergy's customers would be required to submit were included as exhibits attached to the KCC's order. These forms include the following provisions:

- "Evergy's written Consent is necessary for a Retail Customer to participate in SPP's Integrated Marketplace Demand Response program(s). . . . [*W*]*ith such Consent not to be unreasonably withheld or delayed*." (Emphasis added.)
- "The Retail Customer's participation in SPP's Integrated Marketplace Demand Response program(s) through a [demand response aggregator] will at all times respect the operational constraints identified by Evergy in the course of Evergy's SPP registration review process or in response to operational issues subsequently identified by Evergy."
- "The Retail Customer acknowledges and agrees that Evergy may require it to cease or alter its participation in SPP's Integrated Marketplace Demand Response program(s) for operational or safety reasons."

These forms also included a variety of information and reporting requirements customers were required to comply with to obtain Evergy's consent to their participation in SPP's wholesale marketplace demand response programs, whether participating through an aggregator or directly. Evergy maintains that the tariff only regulates

individual customers' interactions with aggregators of demand response and with their electricity provider on the retail market—not the aggregators' interactions with the wholesale marketplace. And Evergy contends the federal government does not have authority to make regulations about the interactions between customers and distributed energy resources' participation and the wholesale market, its authority extends only to the aggregators who are actually operating in the wholesale market.

The FPA gives FERC jurisdiction over the "[u]se or sale of electric energy in interstate commerce . . . apply[ing] to the transmission of electric energy in interstate commerce and *to the sale of electric energy at wholesale in interstate commerce*." (Emphasis added.) 16 U.S.C. § 824(b). That said, the sale of demand response is not really a sale of electricity, but the sale of non-use of electricity. And the *EPSA* Court concluded that FERC has jurisdiction over demand response because it has jurisdiction over practices "'directly affect[ing] wholesale rates,'" including participation and compensation of demand response in wholesale markets. 577 U.S. at 277-78. While the federal government occupies the field of direct regulation of the wholesale energy market, the regulation of demand response is not "hermetically sealed." 577 U.S. at 281.

The FPA does not exclude the states from regulating the integration of distributed energy resources onto the distribution grid, nor was the FPA enacted to displace existing state regulations. Instead, the FPA reflects a cooperative federalism model in which federal and state powers are complementary and comprehensive. *EPSA*, 577 U.S. at 288 ("Wholesale demand response as implemented in the Rule is a program of cooperative federalism, in which the States retain the last word.").

> "Pre-emption inquiries related to such collaborative programs are particularly delicate.
> This Court has said that where 'coordinate state and federal efforts exist within a
> complementary administrative framework, and in the pursuit of common purposes, the
> case for federal pre-emption becomes a less persuasive one.' That is not to say that pre-

emption has no role in such programs, but courts must be careful not to confuse the 'congressionally designed interplay between state and federal regulation,' for impermissible tension that requires pre-emption under the Supremacy Clause. [Citations omitted.]" *Hughes*, 578 U.S. at 167 (Sotomayor, J., concurring).

Considering the nature of the practice of demand response, and the lack of direct regulatory authority in the field of individual retail customer participation—rather than aggregator participation—in wholesale demand response markets, the conclusion that the tariff at issue is field preempted is less tenable. The district court reached the same result: "Because FERC has considered conflicts with state regulatory agencies in the context of managing electrical energy running through local transmission grids, the court cannot conclude that FERC, as the federal government, has chosen to occupy the field."

The Supreme Court's recognition that "[s]ome entity must have jurisdiction to regulate each and every practice that takes place in the electricity markets, demand response no less than any other," suggests that a finding that the tariff is preempted would leave Evergy's retail customers free from the purview of any regulation. *EPSA*, 577 U.S. at 289. This point is salient because of the importance of state regulations to ensure the safety and reliability of the local distribution grid when retail customers are seeking to participate in the wholesale market. The "'scheme of federal regulation'" regarding retail customer participation in demand response programs offered by ISOs and RTOs, such as SPP, in the wholesale market is not "'so pervasive as to make reasonable the inference that Congress left no room to supplement it.'" *Pacific Gas & Electric*, 461 U.S. at 204. Because the KCC's approval of the tariff does not expressly decide an issue in a field left to the federal government to regulate, we conclude it is not field preempted.

*Conflict Preemption*

"[E]ven if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. National Foreign Trade*

36

*Council*, 530 U.S. 363, 372, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000). As noted above, the United States Supreme Court has identified two types of conflict preemption: (1) facial or per se conflict, where "it is impossible for a private party to comply with both state and federal requirements," and (2) obstacle preemption where a "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *English v. General Electric Co.*, 496 U.S. 72, 79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990). "In the context of regulations issued by federal agencies, 'an agency regulation with the force of law can pre-empt conflicting state requirements.'" *Powerback Rehabilitation*, 321 Kan. at 240; see *Fidelity Federal Sav. & Loan Assn.*, 458 U.S. at 153 ("[F]ederal regulations have no less pre-emptive effect than federal statutes.").

To begin, any argument that the tariff is conflict preempted under an impossibility theory fails. Impossibility preemption exists only when it is "impossible for a private party to comply with both state and federal requirements." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618, 131 S. Ct. 2567, 180 L. Ed. 2d 580 (2011). The conflict between state and federal laws must be positive and direct to make coexistence impossible and to find that federal law preempts state law. *Doty*, 272 Kan. at 891. Here, a retail customer in Kansas could comply with both the requirements of the tariff and any federal regulations imposed by the SPP for their participation in a wholesale demand response program. Although there is a possibility that Evergy would not consent to a retail customer's participation—if they failed to provide the requisite information or submit the required forms—it cannot be said that compliance with the tariff makes it impossible to comply with any particular federal regulation. The remaining question, then, is whether the tariff stands as an obstacle to federal law and frustrates its full purposes and objectives.

The United States Supreme Court has cautioned that an "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'" because "such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Chamber of*

*Commerce of United States v. Whiting*, 563 U.S. 582, 607, 131 S. Ct. 1968, 179 L. Ed. 2d 1031 (2011). "State regulation of production may be pre-empted as conflicting with FERC's authority over interstate transportation and rates . . . if state regulation prevents attainment of FERC's goals; or if a state regulation's impact on matters within federal control is not an incident of efforts to achieve a proper state purpose." *Northwest Central Pipeline*, 489 U.S. at 515-16. When the State is legitimately regulating a matter of state concern, "FERC's exercise of its authority must accommodate" that state regulation "[u]nless clear damage to federal goals would result." 489 U.S. at 522.

In *National Association of Regulatory Utility Comm'rs v. FERC*, 964 F.3d 1177, 1187-88 (D.C. Cir. 2020) (*NARUC*), the United States Court of Appeals, District of Columbia Circuit, noted that while a state cannot use its authority over distribution facilities to dictate the terms of a resource's participation in wholesale markets, state regulators nevertheless retain the ability to regulate matters within their jurisdiction:

> "States retain their authority to impose safety and reliability requirements without interference from FERC, and [electric storage resources] must still obtain all requisite permits, agreements, and other documentation necessary to participate in federal wholesale markets, all of which may lawfully hinder FERC's goal of making the federal markets more friendly to local [electric storage resources]. Any such hinderance is of no concern because FERC's 'vision of reasonableness and justice,' cannot override the statutory limitations of FERC's jurisdiction, 'no matter how direct, or dramatic, [that limitation's] impact on wholesale rates.' [Citations omitted.]" 964 F.3d at 1188.

Evergy's tariff appears to be aimed at matters within the purview of state obligations to ensure the reliability and safety of Kansas' electrical grid—not at matters within FERC's jurisdiction to set just and reasonable rates in the wholesale market. As the district court summarized:

"In this case, Evergy has been concerned with the flow of information it needs in order to plan and prepare to meet its obligations to Kansas consumers in its territory. Those concerns are increased when DR options beyond Evergy's control are introduced into its planning equations and impacts its local distribution grid. Those DR options, by their nature, are intermittent and temporary. Information, generally, must be seen as a significant component to the regulated utility's ability to plan, produce, and deliver safe, reliable, and reasonably priced electricity to its customers."

Similarly, the KCC described the focus of the tariff's requirements as being aimed at information sharing and coordination between Evergy, demand response aggregators, and retail customers seeking to participate in demand response programs to ensure that such programs can be reliably and efficiently run without impacting the electrical grid. The tariff includes the adoption of information forms for customers wanting to participate in demand response programs offered in the SPP. These forms require information such as customer addresses and other contact information, account numbers affected, meter numbers, the megawatt load impact or demand response, equipment descriptions, and any generation resources at the customer's address. The tariff also requires a customer to provide a notice of termination or discontinuation of participation in a demand response program and included "general terms of participation." In sum, the tariff is aimed at ensuring that demand response providers, who are themselves retail customers of Evergy, participate in the wholesale market in a way that ensures the reliability of Kansas' grid.

Sierra Club and Vote Solar assert that the tariff's target is their members' participation in the wholesale market because the tariff allows Evergy to deny a customer's participation in a demand response program on the wholesale market if they do not supply the required information and consent forms. They argue the tariff—by giving Evergy the power to consent to consumer participation in demand response programs in the wholesale market—effectively supplants the role of RTOs and ISOs and thereby expands state authority into a regulatory territory occupied by the federal

government. The district court's analysis similarly focused on the authority the tariff gave Evergy to deny its consent to a customer's participation in the wholesale market.

Whether the tariff gives Evergy too much discretion in reviewing the information from a customer seeking to participate in the demand response market and deciding whether to consent to their participation does not change the fact that the tariff is addressing a matter of legitimate state concern. While it could have been the focus of an analysis of whether the KCC's approval of the tariff was unreasonable under the circumstances, this feature of the tariff does not necessarily mean it is unconstitutional under the doctrine of conflict preemption. Also, as the KCC pointed out in approving the tariff, Evergy's consent to its customers' participation was already included in the existing tariff since at least 2018—the updated tariff merely added the explicit categories of information and various forms that Evergy's customers would need to provide to obtain that consent. In other words, even if this court were to find that the tariff was preempted on those grounds, the older version of the tariff would presumably remain in effect, allowing Evergy to deny customers from entering the wholesale market without explicitly providing a list of the information Evergy requires to maintain the reliability of the grid.

As mentioned, the retail customer registration and consent forms that Evergy's customers would need to submit provided that although Evergy's consent is necessary for a customer to participate in demand response, *such consent would not be unreasonably withheld or delayed*. Darrin R. Ives, Evergy's Vice President for Regulatory Affairs, provided rebuttal testimony before the KCC to address the concern about Evergy denying consent to any customer wanting to participate in wholesale demand response:

> "[C]oncerns that the [tariff] provisions would be used to block [demand response] participation are without merit. If Evergy was interested in blocking DRA participation in the wholesale market, it would have advocated that the Commission exercise its right and opt out pursuant to FERC Order No. 719 given the unknown impacts DRAs will have on Evergy's system. . . .

40

Instead, Evergy is proactively trying to address communications concerns and correct customer information discrepancies through its proposal. Evergy is not opposed to DR in its service territory provided that the operational, safety, and reliability issues can be addressed, as well as questions regarding appropriate cost causation and cost allocation."

It is unclear why Evergy would want to indiscriminately deny a customer's participation in a demand response program, as such participation is not contrary to Evergy's interests and generally benefits all retail consumers of electricity. Concerns about Evergy exercising this power seem more conceptual than practical. And if Evergy would deny any customer's participation in a demand response program, the customer could seek redress with the KCC. Evergy would not have the last word on the matter.

Ultimately, the tariff's potential impact on matters within federal control—wholesale rates and participation in demand response programs in the wholesale market—is an incident of efforts to achieve a proper state purpose—the safety and reliability of the local distribution grid. Because the target of the tariff is an issue within the KCC's regulatory concerns, it is not conflict preempted on those grounds.

Finally, while the tariff could potentially have some impact on federal goals for the demand response programs in the wholesale market, it does not prevent or clearly damage those goals. The district court appears to have found that the tariff was conflict preempted because it could interfere or impede federal policies and programs. The district court found that the tariff conflicts with the authority of the federal government to "effectuate its public policies in matters of interstate commerce" and "with the operation of the federal programs." But the bar for finding conflict preemption is higher than that.

The Supreme Court has recognized that a conflict preemption analysis is "a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. Requiring a court to look to

41

"'the entire scheme of the statute'" and determine "'[i]f the purpose of the [federal] act cannot otherwise be accomplished—if its operation within its chosen field [would] be frustrated and its provisions be refused their natural effect.'" 530 U.S. at 373. In the jurisdictional scheme provided by the FPA, there is no conflict preemption "[u]nless clear damage to federal goals would result." *Northwest Cent. Pipeline*, 489 U.S. at 522.

FERC's powers over retail customer participation in demand response programs in the wholesale market stem from its authority over transmission of energy in interstate commerce and its requirement to ensure just and reasonable wholesale energy prices. *EPSA*, 577 U.S. at 277-78. Sierra Club and Vote Solar maintain that the district court correctly found that the tariff conflicts with federal law because it "impose[s] burdens on wholesale market participation that FERC sought to avoid because additional burdens prevent FERC's goal of maximum wholesale market participation." They categorize the federal regulation as a policy of "minimal regulatory burdens and uniform standards leading to maximum participation in the wholesale market." They point to the tariff potentially extending registration review period and creating a second registration process beyond what is required by the SPP. But it is unclear how providing the information the tariff requires imposes any real burden or would deter participation in such programs.

The tariff does not prevent retail customers from participating in demand response programs—it imposes minimal informational requirements on retail customers who want to sell their non-use of electricity. It requires retail customers to provide information so that Evergy can ensure the Kansas grid remains reliable. The tariff does not conflict with FERC's ratemaking authority. Rather than turning over the decision about who can participate in wholesale demand response to Evergy, the tariff asks those entering the wholesale market to provide information needed by Evergy to safely and reliably maintain the local distribution grid and fulfill its obligations to its retail customers. While a retail customer may feel that providing this information is burdensome, a fair reading of

the tariff's requirements and provisions reflect they would not damage federal policies and regulations related to demand response programs in the wholesale market.

In sum, despite federal regulation of wholesale demand response programs, states retain jurisdiction over matters implicating the safety and reliability of the electrical grid. Although the tariff could have some impact on federal regulation of demand response programs in the wholesale market, it does not regulate a field that is entirely occupied by the federal government, it does not make compliance with federal law impossible, and it is not an obstacle to the accomplishment and execution of the full purposes and objectives of FERC's various regulations governing the use of demand response in the interstate wholesale market. Thus, we conclude the tariff is not preempted by federal law.

### THE KCC DID NOT EXCEED ITS AUTHORITY UNDER KANSAS LAW TO REGULATE RETAIL CUSTOMER ACTIVITIES IN WHOLESALE MARKETS

In their cross-appeal, Sierra Club and Vote Solar argue that if this court determines that the updated tariff is not preempted, then it should nevertheless uphold the district court's reversal because the KCC lacks the authority to regulate retail customer activities in the wholesale market. They also assert that permitting the KCC to regulate customers' activities in the demand response through tariffs "is inconsistent with principles of limited government." Evergy maintains that the KCC acted within the scope of its authority under the Kansas Electric Public Utilities Act (EPUA), K.S.A. 66-101 et seq., when it approved the non-unanimous settlement order.

Whether the KCC had authority to enter the settlement order approving the tariff is a question of law subject to unlimited review. See *Danisco Ingredients USA, Inc. v. Kansas City Power & Light Co.*, 267 Kan. 760, 765, 986 P.2d 377 (1999). Statutory interpretation also presents a question of law subject to unlimited review. *Central Kansas Medical Center v. Hatesohl*, 308 Kan. 992, 1002, 425 P.3d 1253 (2018).

43

"In Kansas, the regulation of public utilities is legislative—not judicial." *Grindsted Products, Inc.*, 262 Kan. at 309. As a utility provider, Evergy is regulated by the KCC, which includes the requirement to file its tariffs with the KCC. K.S.A. 66-101c.

> "Tariffs are those terms and conditions which govern the relationship between the utility and its customers. Public utilities in this state are required to file their tariffs with the KCC. K.S.A. 66-101c. Rates, fares, tolls and charges imposed by a public utility upon its customers are required to be just and reasonable, not unjustly or unreasonably discriminatory and not unduly preferential. K.S.A. 66-101d. Tariffs filed with regulatory agencies must comport with any conditions, schedules, and provisions authorized by the agency, and amended tariffs and schedules of rates are not effective unless approved by the KCC. Tariffs duly filed, however, generally bind both the utility and the customer." 262 Kan. at 309.

The EPUA gives the KCC "full power, authority and jurisdiction to supervise and control the electric public utilities, as defined in K.S.A. 66-101a, doing business in Kansas," and empowers the KCC to "do all things necessary and convenient for the exercise of such power, authority and jurisdiction." K.S.A. 66-101. And K.S.A. 66-101g indicates that all grants of authority to KCC "shall be liberally construed, and all incidental powers necessary to carry into effect the provisions of this act are expressly granted to and conferred upon the commission." In the interest of the public and the utility's customers, the Kansas Legislature granted the KCC the broad authority to adopt tariffs, or rules, effective against public utilities. See K.S.A. 66-101 et seq. Sierra Club and Vote Solar's argument effectively boils down to the fact that none of the authorizing statutes mention regulations over retail customers participating in demand response programs—but this does not imply that the KCC lacks authority.

The EPUA mandates that the KCC review and ensure the reasonableness of all rules and practices in the electric utility industry rules and practices in Kansas. If the KCC could not impose regulations on the source of demand response—the retail

44

customers selling their non-use of electricity—then no demand response program could go forward. If the KCC had no authority to regulate retail customers participating in demand response, it would be left powerless to fulfill its statutory duties of ensuring that Kansans are provided "just and reasonable" electricity prices and that the electricity service is reasonably "sufficient and efficient." K.S.A. 66-101b.

As noted above, "Congress passed the FPA precisely to eliminate vacuums of authority over the electricity markets . . . [and] prevents the creation of any regulatory 'no man's land.'" *EPSA*, 577 U.S. at 289. Moreover, "[s]ome entity must have jurisdiction to regulate each and every practice that takes place in the electricity markets, demand response no less than any other." *EPSA*, 577 U.S. at 289. Sierra Club and Vote Solar's argument that the KCC's authority is subject to narrow and rigid statutory limits would effectively strip the KCC of the flexibility to regulate the electrical grid that the Legislature conferred on it, leaving no local regulator in place to protect the public interest in the face of complex, modern utility challenges.

The KCC has authority to make regulations about demand response because it has authority to protect the safety and reliability of the retail distribution system of electricity. It has express authority to regulate, through tariffs, the relationship between the utilities and their customers. *Danisco*, 267 Kan. 760, Syl. ¶ 2. K.S.A. 66-101 grants the KCC power "to do all things necessary and convenient" to "supervise and control the electric public utilities." The KCC must also have the authority to impose reasonable restrictions on customers' actions that could endanger the system's safety and reliability. We conclude the KCC properly exercised that authority here by reviewing and approving tariff updates that will help ensure Evergy can meet its obligation to provide "'reasonably efficient and sufficient service and facilities'" at "'just and reasonable rates.'" 267 Kan. at 765.

CONCLUSION

Because both Sierra Club and Vote Solar produced evidence from at least one of their members suggesting that they faced an imminent and particularized injury by being subjected to the terms of Evergy's tariff, they have established associational standing. Although the tariff could have some impact on federal regulation of demand response programs in the wholesale market, it does not regulate a field that is entirely occupied by the federal government, it does not make compliance with federal law impossible, and it is not an obstacle to the accomplishment and execution of the full purposes and objectives of FERC's various regulations governing the use of demand response in the interstate wholesale market. Thus, the tariff is not preempted by federal law. Finally, by entering the settlement order approving the tariff, the KCC did not exceed its authority under Kansas law to regulate retail customer activities in wholesale markets.

Reversed.